ALEXANDER M. LAWRENCE AND OTHERS, CLAIMANTS OF THE SHIP HORNET, APPELLANTS, v. CHARLES MINTURN.

A consignee of goods has a right, in his own name, to libel a vessel for their non-delivery, unless there is something to show that he had no interest in them. The presumption is, that he had an interest, and to defeat the right to sue, in his own name, this presumption must be rebutted by proof.

In the present case, there is no such proof.

The goods being thrown overboard, the facts in this case show that the jettison was justifiable, and the loss occasioned by the perils of the sea.

The nature of the contract explained between the master and owner of a vessel and the shipper, where the latter knows that the articles shipped are to be carried upon the deck, and the cases upon this subject examined.

In this case, the evidence shows that there was no want of due diligence and skill, either in the construction of the vessel or the stowage of the cargo.

THIS was an appeal from a decree of the district court of the United States for the northern district of California, sitting in admiralty. Minturn libelled The Hornet, for the non-delivery of two steam-boilers and chimneys, shipped on board of that vessel in the port of New York, and consigned to the libellant.

Alexander M. Lawrence and seven others intervened, as claimants, and after a hearing upon the pleadings and proofs, the district judge decreed that the libellant should recover $25,275, and costs. From this decree the claimants appealed to this court.

The case is stated in the opinion of the court.

It was argued by *Mr. Cutting*, for the appellants, and by *Mr. Lord*, for the appellees.

*Mr. Cutting*, before stating the points of law which arose in the case, examined the evidence, from which he contended that the following positions were established : —

1. That the ship Hornet was as good a ship as sailed out of the port of New York, at the time she commenced this voyage, and as well qualified as any vessel of her size to carry the boilers in the manner in which they were shipped.

2. That the contract of affreightment was, that the boilers should be carried on deck, in the manner in which they were carried.

3. That the boilers were stowed, and secured in that position, in the best and safest manner; and that the residue of the cargo was well stowed with regard to carrying the boilers on deck. She was in good sailing trim, and steered very well.

4. That in the judgment of all the experienced navigators who have testified on this subject, without a dissenting voice, the ship was, at the time of leaving the port of New York, capable of carrying the boilers, as a deck load, to San Francisco. That the shipper and his agents assented to, and acquiesced in,

that judgment. And no evidence has been furnished that any person entertained, much less expressed, a doubt of the success of the voyage.

5. That it would not have been possible to carry the boilers to San Francisco, or to have retained them longer on the ship, consistently with the safety of the lives of those on board.

The experience acquired in the first storm clearly established this.

6. That the boilers were thrown overboard as soon as it was practicable, after the ship encountered the gale.

7. That this jettison was with due deliberation, and an act of necessity.

8. That the ship-owners were not guilty of any negligence, even the slightest, either in undertaking to transport these goods on deck, or in the construction, equipment, or navigation of the ship, or in the stowage of these goods, or in the manner of stowage of the rest of the cargo in reference to these goods, or in the quantity of cargo taken in below deck.

## *Points of Law.*

I. The libellant had no right, merely as consignee, to institute this action in his own name.

II. The boilers were lost by one of the excepted perils, even if the ship be held to its responsibility as a common carrier.

1. The carrier is not responsible for the loss by jettison of goods laden on deck with the assent of the shipper, when such jettison is necessary to save the vessel and the crew. Gould *v.* Oliver, 4 Bing. N. C. 142, per Tindal, C. J.; Case cited by Coke, in Bird *v.* Astcock, 2 Bulst. 280; Approved Sto. on Bail. § 531; Mouse's Case, 12 Coke, 63; Gillett *v.* Ellis, 11 Ill. R. 579; Johnston *v.* Crane, 1 Kerr. 356 (New Brunswick Rep.); Smith *v.* Wright, 1 Caines's R. 43, and note (a,) 45; Crosby *v.* Fitch, 12 Conn. 419, 420; Da Costa *v.* Edmunds, 4 Camp. 142.

2. The loss occurred by dangers of the seas, within the meaning of the bill of lading. The gale of the 26th and 27th of August, was a severe gale, accompanied by a very heavy cross sea, which strained the ship, opened her seams, and caused her to leak badly; under these circumstances the weight of the boilers caused the decks to settle, and jeoparded the safety of the vessel. Although she was capable of withstanding ordinary weather, it was manifest that she could not outlive another gale.

3. The loss could not have been guarded against, or foreseen by any ordinary exertion of human prudence or skill. The

shipper and the ship-owners, in this respect, concurred in the judgment that the ship was capable of carrying this extraordinary deck load, and all proper precautions were adopted, in order to insure its safety.

4. The circumstance that human agency intervened to cast the boilers into the sea, makes it none the less a loss by perils of the seas. Hagedorn *v.* Whitmore, 1 Stark. 157; Barton *v.* Wollirord, Comb. 56; Gillett *v.* Ellis, 11 Ill. 579; Smith *v.* Scott, 4 Taunt. 126.

III. The shipper having contracted for the shipment of the boilers on deck, cannot, in the absence of fault or negligence in the carrier, recover for a loss by perils incident to that mode of transportation. Gould *v.* Oliver, Tindal, C. J., 4 Bing. N. C. 142; Baxter *v.* Leland, Blatch. R. 526; Clark *v.* Barndwell, 12 How. 272, 281–2; Shackleford *v.* Norton, 9 Louisa. R. 33, 39; Angell Car. §§ 215, 217.

It was by one of that class of perils that the boilers were lost.

IV. The ship-owners were not common carriers as to these goods; they were special bailees under a particular contract, and in respect to this transaction, are to be treated as private carriers, who incur no responsibility beyond that of an ordinary bailee for hire. They are answerable only for misconduct or negligence, or the want of that diligence which prudent men commonly take of their own goods. Special Contract, 5, 66; N. J. S. Nav. Co. *v.* Merchants' Bank, 6 How. 344, 382; Citizens' Bank *v.* Nantucket Steamboat Co. 2 Sto. R. 16, 34, 36; Allen *v.* Sewall, 6 Wend. 335, 355, 364; Wells *v.* The Steam Navigation Co. 2 Comstock R. 208; Edwards *v.* Sherratt, 1 East. R. 604, 611; Thomas *v.* Prov. and Bos. R. R. Co. 10 Metc. 472; Angell on Car. §§ 45, 46, 54, 89; Sto. on Bail. § 442.

V. The ship-owners did not warrant or insure that the ship should be competent to carry the boilers on her deck to San Francisco.

VI. The libel does not aver unseaworthiness, incapacity, or fault of the ship, or any improper stowage of cargo, or any overloading of the ship; and on the contrary it alleges the failure to deliver, to have been caused solely by the mere carelessness, unskilfulness, and misconduct of the master and mariners. The proofs and the right to recover must be confined to the allegations. 1 Car. and Payne, 251; Houseman *v.* Schooner North Carolina, 15 Pet. 50.

This objection was taken at the trial, but the court ruled, that if the loss was occasioned by the overloading of the ship, proof might be given of that fact, and the libel sustained. Even if

this ruling was correct, no proof of the vessel being overloaded was given; nor was she overloaded. The lading of the boilers on deck made the ship uneasy; but it was the shipper, and not the master and mariners, who caused them to be placed there, and the latter cannot be charged with carelessness, unskilfulness, or misconduct, on that account.

VII. The damages decreed to the libellant are excessive.

*Mr. Lord*, for the appellee, stated the libel, and then said,

The ship, in answer, sets up two matters in defence : —

1. That the shipper, in making the freighting contract, deceived the agents of the ship, by representing the weight at about forty tons, when, in fact, it is alleged to have exceeded fifty tons, in the shipper's knowledge, on which representation the agents relied.

2. That the ship having sailed from New York, on the 23d August, 1851, experienced a storm at sea, near the edge of the Gulf Stream, on the 26th of August, in which the ship labored severely; the gale continued twenty-four hours; the ship was very uneasy under her deck load, and on the 29th August, considering the ship in danger, and she leaking badly, the master determined, after the gale was over, to throw over the deck load, to avoid the dangers which might arise in the next gale which might occur. And that, on the 6th of September, the preparations were begun for throwing over the steam machinery, which was accomplished by the 12th September. She afterwards experienced the Equinoctial gale, commencing September 17th, and continuing until the 26th, in which the ship, if she had not been relieved of her deck load, would, it is averred, have foundered at sea, or leaked so as to damage all the cargo.

## *Points.*

*First Point.* As to the pretended misrepresentation, no stress appears to have been laid on it in the court below. In fact, the freight contract was made on the 19th July, 1851, while the machinery in question was in the course of construction, and its weight unknown to the libellant. It was made by Cunningham, Belknap, and Co., and finished between the 1st and 19th August.

*Second Point.* The next question involved is, whether the jettison was owing to the perils excepted in the carrier's engagement, namely: dangers of the sea, fire, and collision. The two latter are to be laid out of view, as having no bearing on the case; and the only question is, whether the jettison was caused by dangers of the sea.

Lawrence et al. *v.* Minturn.

1. The contract of the carrier in its nature requires the utmost care and diligence on his part, and also a ship fit and capable of performing the engagement, unless defeated in so doing by *vis major*. Although perils of the sea be the immediate cause, still, they are not within the exception, unless they have been encountered after all the obligation of the carrier has been performed. Thus, if badly stowed, and thereby exposed to sea perils in a storm, or if the ship be unfit for the voyage, the occurrence of sea accident to cargo thus exposed to them, will not discharge the carrier.

As the obligation of the carrier is, by his own contract, he would be liable on the principles of law, notwithstanding all accidents, unless he had expressly excepted them. And the exception is not to be enlarged by implication. See Spence *v.* Chodwick, 10 Adol. and Ellis, N. S. Rep. 517, where the law is reviewed.

2. Loading a ship beyond her capacity is a matter at the charge of the carrier. His contract warrants her ability to perform the voyage in safety, so far as that depends on the ship. Secret defects are at his risk, and not at that of the shipper. He is to determine the quantity of cargo she can safely carry. He alone can be presumed to know her capabilities, defects, and weaknesses. It is his instrument for performing his contract, and as he gains by its perfection, he must suffer by its imperfection.

3. Indeed, it seems scarcely reasonable to pretend, that where the subject is exposed to the sea, as a cause of danger, it can be said to suffer from that, when it was not prepared to meet it: and suffers only from the defective, unskilful, careless, or insufficient means adopted to guard against the danger.

4. It must therefore be judged, that overloading, or improperly loading a ship, takes away the exception of the bill of lading, especially if the damage to cargo arises from it.

Now, overloading and improperly loading have reference to the capabilities of the ship, whether old or new, well built or badly built, staunch or weak, in relation to the cargo which is engaged to be carried, and the place where it is to be placed. All these are matters within the engagement of the carrier, and are to be carried out by him.

5. And the burden lies on him to excuse himself, by showing that the damage arose without his fault and by the excepted peril. The shipper commits his goods to the carrier's care, he is not present during the voyage, he cannot detect secret faults or neglects, and is in no equality with the carrier, as to proving the cause of the loss. The law throws the burden of making out the whole excuse on the carrier.

*Third Point.* Has the carrier, in this case, shown the jettison within the exception, as thus expounded ? Has the ship met the storms and gales to be expected on her voyage, with suitable fitness to meet them, so far as her own carrying qualities and a reasonable loading are involved ?

The evidence may be classed into that which relates: 1. To the commencement of the voyage. 2. To the conduct of the ship before jettison. 3. To her conduct afterwards ; from all which it will appear that the ship-owner loaded her too heavily. The evidence of the claimant's witnesses alone will be cited.

*Mr. Lord* then examined the evidence.

*Fourth Point.* The libel is properly brought in the name of Charles Minturn, the consignee, to whom the delivery was to be made, and by whom the freight was to be paid. The bill of lading was a sufficient contract and title paper to him.

Mr. Justice CURTIS delivered the opinion of the court.

This is an appeal from a decree of the district court of the United States for the northern district of California, sitting in admiralty. The appellee filed his libel in that court, against the ship Hornet, for the non-delivery of two steam-boilers and chimneys, shipped on board that vessel in the port of New York, and consigned to the libellant.

The appellants intervened, as owners of the ship, and, upon the pleadings and proofs, the district court made a decree in favor of the libellant. The claimants appealed.

The first question to be determined on the appeal is, whether the libellant had a right to sue in his own name. The facts bearing on this question are, that on the nineteenth day of July, 1851, Edward Minturn, at New York, made a contract with the agent of the ship Hornet, which was reduced to writing, as follows : —

Memorandum of agreement to ship on board the ship Hornet, by Edward Minturn, Esq., two boilers, two chimneys or steam-chests, smoke-pipes in sheets, and some grate bars, in all about forty tons weight, from this port to San Francisco, California, for the sum of forty-five hundred dollars, with five per cent. primage : the whole to go on deck, except the grate-bars and sheet-iron for smoke-pipe. It is understood that the shipper is to put them on the deck of the vessel at his expense, and the ship is to discharge them as soon as convenient, and they are to be received at Cunningham's wharf, in San Francisco, without other than the ordinary charge per day for discharging. It is further understood that the said boilers are to be ready to go on board the

vessel on the ninth day of August, or as soon thereafter as the ship may require them, giving shipper two days' notice thereof.

(Signed)                                       EDWARD MINTURN.
                                                    E. B. SUTTON,
                                                    *Agent for ship Hornet.*

It appeared that the boilers and chimneys were manufactured in New York, upon an order given by James Cunningham; that they were intended for the steamer Senator, a boat then in California; that James Cunningham and Edward Minturn were part owners of The Senator, and that they paid the makers for these articles. The bill of lading was as follows:—

210. Shipped, in good order and well-conditioned, by Edward Minturn, on board the ship called The Hornet, whereof Lawrenc is master, now lying in the port of New York, and bound for San Francisco, California, to say: two boilers, and two steam-chimneys for ditto, eight pieces sheet-iron work, three pieces pipe, one band, two hundred and four grate-bars, sixteen grate-bar bearers, eight boiler bearers, six man-hole plates, eight boiler doors, one bundle (four) bolts, two boxes; the whole to be discharged as soon as convenient, and to be received at Cunningham's wharf, in San Francisco, without other than the usual or ordinary charge for discharging per day; being marked and numbered as in the margin.

Freight    -    -  $4,500 00
5 per cent. primage      225 00
                    ——————
                    $4,725 00
            E. B. SUTTON,
                84 Wall street.
Dispatch line California packets.

Goods to be delivered at the vessel's tackles when ready to be delivered. Not accountable for breakage, leakage, or rust; freight payable before delivery, if required; and are to be delivered, in like order and condition, at the port of San Francisco, (the dangers of the seas, fire, and collision only excepted,) unto Charles Minturn, or to his assigns, he or they paying freight for the said boilers, steam-chimneys, and other iron work, forty-five hundred dollars, with five per cent. primage, and average accustomed.

[Contents unknown.]

In witness whereof the master or purser of the said vessel hath affirmed to four bills of lading, all of this tenor and date, one of which being accomplished, the others to stand void.

Dated in New York, the 19th day of August, 1851.

(Signed)                                       WILLIAM W. LAWRENCE.

Upon the proofs, we are of opinion that the libellant had a right to sue the carrier in his own name. He is the consignee named in the bill of lading; and, in the absence of evidence to control the effect of that document, the property is presumed to

be in him. In Evans *v.* Marlett, 1 Lord Raymond, 271, it is laid down that "if goods, by bill of lading, are consigned to A, A is the owner, and must bring the action against the master of the ship if they are lost; but if the bill be special, to be delivered to A, to the use of B, B ought to bring the action."

Whether it be strictly correct to affirm that in the case first put, A shall have a right of action against the carrier, though in point of fact he be only an agent for the consignor, has been much controverted. In Griffith *v.* Ingledew, 6 S. and R. 429, goods were shipped by A for his own account and risk, but deliverable under the bill of lading to B or his assigns. The previous decisions were examined with great care. There was a difference of opinion on the bench, Mr. Justice Gibson dissenting; but the majority of the court held, that by force of the bill of lading the legal title was in the consignee, and he could maintain the action.

Since that decision was made, the question has been much discussed, both in this country and in England. It is not easy to reconcile the decisions. We shall not attempt to do so here; the case does not require it. For, if we take the rule to be that an action against the carrier cannot be brought by a consignee who has no beneficial interest in the goods, it still remains true, that a presumption of such an interest in the consignee arises from a bill of lading which makes the goods deliverable to him or his assigns. This is admitted in the cases in which it has been held that the consignee had not the right of action or was not liable for the freight. Coleman *v.* Lambert, 5 M. & W. 502; Wright *v.* Snell, 5 B. and Ald. 350; Chandler *v.* Spraigne, 5 Met. 306.

In Grove *v.* Brien et al. 8 How. 439, this court said: "The effect of a consignment of goods generally is to vest the property in the consignee;" and though it is also there declared that this effect may be controlled by special clauses in the bill of lading, or by evidence aliunde, yet the general effect of a bill of lading to raise a presumption of property in goods in him to whom it makes them deliverable, is conceded.

This is in accordance with the rule given in Abbott on Shipping, pages 415, 416.

Such being the presumption arising from the bill of lading, we do not find it to be controlled by any proof in this case. It does appear that Edward Minturn and James Cunningham were part owners of The Senator, for which boat these boilers and chimneys were intended, and that they contracted with the makers of the articles and paid for them, and that Edward Minturn shipped them in New York. But all this leaves open the question, whether the libellant was not the managing owner

and ship's husband of The Senator, residing in California, where that boat was employed, attending to its repairs and supplies, for the joint account of himself and the other owners. Indeed, the testimony of Squire, an agent of the libellant, in the absence of all other evidence, tends to prove that such was the fact; for he speaks of himself as acting for the libellant in reference to the management of The Senator, and says that, her boilers being worn out, an order was sent out to obtain new ones, to replace the old. We understand this order to have been given by the libellant, for the boilers now in question.

Considering the burden of proof to have been on the respondents to displace the *primâ facie* right of action of the consignee, arising from the bill of lading; that for aught he has shown, and upon the proof, we may conclude that the consignee ordered these articles as managing owner of The Senator; and that if so, he, as consignee and managing owner, might sustain the libel in his own name; this objection to the decree must be overruled.

The next inquiry is, whether the failure to deliver the boilers and chimneys is justified?

The Hornet sailed from New York, on the 23d of August, 1851, having these articles on deck. On the 5th of September the chimneys, and on the 12th of September the boilers, were thrown overboard.

Two questions arise:—

1. Was the jettison necessarily made for the common safety? and, if so,

2. Was the necessity attributable to any, and what, fault on the part of the master or the vessel?

The material facts upon which the first of these questions depends, are, that The Hornet was a clipper-ship of about sixteen hundred tons burden, built at New York, in the years 1850 and 1851, of the best materials in use for first-class ships at that port. She had a cargo under deck, and the weight of these boilers and chimneys on deck was somewhat over thirty-one tons. The height of each of the boilers, above the deck at the forward end, when stowed, was about twelve feet. The steam-chimneys were between five and six feet in diameter, and besides these there was a piece of steam-pipe weighing 667 pounds. The ship sailed on the 23d of August, and on entering the gulf stream encountered rather heavy weather and a cross-sea. The performance of the vessel in this sea was found to be bad. On the 26th a gale came on from the south, veering to the northwest, and lasted until the night of the 27th.

Though this gale was not of uncommon severity, it raised a heavy cross-sea. The effect of this sea was to cause the ship

to roll down to leeward, so as to take in water over her rail; she rose very slowly and then rolled over to windward, straining and laboring in a manner described by the witnesses as very unusual. She would not mind her helm, but would fall off; she would settle down aft and take in water over her stern, and plunged heavily forward. At sundown on the 27th, the wind lulled and the sea became more smooth. It was found during and immediately after the gale, that the ship was very severely strained, so as to open some wood-ends aft, one half to three quarters of an inch, and her water-way seam half an inch, and that other injuries, of an alarming character, had been received. The master then held a consultation with his officers, and drew up the following protest: —

August 29, 1851, latitude 31 ° 0′ N., longitude 61 ° 5′ W.

At sea, on board ship Hornet, of New York, William W. Lawrence, master, bound from New York to San Francisco, California.

We, the undersigned, master, officers, and mariners of the ship Hornet, of New York, do, after mature and serious deliberation, enter this solemn protest: That on the 26th day of August, 1851, the ship Hornet being then in or about the longitude of 49° W., latitude 37° N., experienced a gale of wind from south, veering to N. W.; and that during said gale, which lasted until the night of the 27th of August, the weight of the deck load, consisting of two boilers, with furnaces attached, and two steam-chimneys, (the whole supposed to be of the weight of forty tons, or thereabouts,) did cause the ship to labor very hard, rolling gunwale deep, shipping large bodies of water, straining the ship in her upper works and decks, causing the ship to leak badly, and her pumps constantly worked, placing our lives, ship, and cargo, in imminent peril for their safety. We, now, therefore, do most seriously and solemnly assert, that for the future preservation of the ship, and thereby our lives and cargo, the said boilers, furnaces, and chimneys are unsafe on the decks, and for the safety of the whole should be thrown overboard as soon as possible, the weather and sea permitting.

In testimony whereof to the above, we hereby subscribe our respective names.

This protest was signed by all the officers and by such of the crew as could write, and its substantial facts are testified to by the master and officers who were examined in the cause, in such a manner as to satisfy us of their truth.

Upon these facts, we have come to the conclusion that the jettison was necessary for the common safety.

The nature of the case imposes on the master the duty, and clothes him with the power, to judge and determine upon the

facts before him, whether a jettison be necessary. He derives this authority from the implied consent of all concerned in the common adventure. The obligation of the owners is to appoint a competent master, having reasonable skill and judgment, and courage; and they are liable, if through his failure to possess or exert these qualities, in any emergency, the interest of the shippers is prejudiced. But they do not contract for his infallibility, nor that he shall do, in an emergency, precisely what, after the event, others may think would have been best.

If he was a competent master; if an emergency actually existed calling for a decision, whether to make a jettison of a part of the cargo; if he appears to have arrived at his decision with due deliberation, by a fair exercise of his skill and discretion, with no unreasonable timidity, and with an honest intent to do his duty, the jettison is lawful. It will be deemed to have been necessary for the common safety, because the person to whom the law has intrusted authority to decide upon and make it, has duly exercised that authority.

Applying these principles to the case before us, we find no reason to doubt that this jettison was thus necessary. It is true, that when it was actually made, the sea was smooth, and the ship in no immediate danger. But it satisfactorily appears, that these boilers and chimneys could not be thrown overboard, without the greatest risk, when there was any considerable sea. To require delay until a storm, would be, in effect, to prohibit the sacrifice. Precaution against dangers, which are certain to occur, is surely proper. That they must experience gales and heavy seas at that season, in that voyage, was so nearly certain, that it was not unreasonable to act on the assumption that they would occur, and prepare the ship to encounter them while in a smooth sea, when alone they could do so.

We find the conduct of the master and crew in making the jettison to have been lawful, and the remaining inquiry is, whether the necessity for it is to be attributed to any fault on the part of the master or owners.

The libel alleges the loss of the goods to have been " through the mere carelessness, unskilfulness, and misconduct of the said master, his mariners, and servants."

We were at first inclined to the opinion that this allegation is not broad enough to put in issue what the libellants have at the hearing much relied on, and what we think is the main question in this part of the case; the sufficiency of the ship to carry this cargo. It is, no doubt, the general rule, that the owner warrants his ship to be seaworthy for the voyage with the cargo contracted for. But a breach of this implied contract of the owners does not amount to negligence, or want of skill of the master or mariners.

There would be much difficulty, therefore, in maintaining, as a general proposition, that an allegation of negligence of the master would let the libellant in to prove unseaworthiness of the vessel.

But it mus' be observed that this libellant relies not on general unseaworthiness, but upon the fact that a vessel, staunch and sufficient to carry a cargo, was overloaded by this burden on the deck; and as the quantity of lading and the consequent trim and seaworthiness of a vessel are matters as to which the master is, generally speaking, bound to exercise his skill, and over which he is intrusted for the benefit of all concerned with a supervision, his failure to do so properly, is negligence, for which the owner may be liable.   While, therefore, we have some difficulty in respect to the sufficiency of this allegation, we think it is such as necessarily leads us into the inquiry, whether the loss by jettison was occasioned by negligence of the master in overloading the ship.   And as we find it extremely difficult, if not impossible, to distinguish between the obligation of the owners and master, in these particulars, we shall proceed to consider the question whether the case is one of culpable negligence, or is within the exception of perils of the seas contained in the bill of lading.

There can be no doubt that a loss by a jettison, occasioned by a peril of the sea, is a loss by a peril of the sea.   In that case the sea-peril is deemed the proximate cause of the loss. But if a jettison of a cargo becomes necessary in consequence of any fault c. breach of contract by the master or owners, the jettison is attributable to that fault or breach of contract, and not to sea-peril, though that also may be present and enter into the case.   This distinction is familiar in the law of insurance. General Mut. Ins. Co. *v.* Sherwood, 14 How. 365, and cases there cited.

In this case, did the necessity for the jettison arise from any fault or breach of contract by the master or owners?

Two grounds are assumed by the libellant.   The first is, that considering the great weight of these articles, resting upon a' small part of the upper deck, sufficient means were not used to support the weight and stiffen the ship, so as to prevent the deck from being strained.

This was a new ship, built of such materials, and so fastened and braced, as to be uncommonly strong.   The owners employed a ship-carpenter, who had worked on the vessel when built, to do what he deemed necessary to support this unusual weight on the deck.   He describes what was done.   The master superintended these alterations.   He and the carpenter deemed them sufficient.   They were both going to sea in the vessel, the one

as commander, the other as carpenter, and can hardly be supposed to have omitted any thing which they thought necessary for safety. The owners do not appear to have restricted them, in point of expenditure. We cannot avoid the conclusion that every thing was done which these men thought necessary; and possessing, as they must be presumed to have done, competent skill in their respective occupations, they believed this part of the cargo was securely stowed, and fastened and stayed, to go safely on the voyage. In point of fact, however, after being subjected to the action of the sea in a storm, it was found the deck had settled.

The second ground taken by the libellants is, that the ship was so overloaded, by the great weight of these articles on deck, as to be unseaworthy; and as the jettison was made to relieve the vessel from this condition, the owners are responsible for the loss. In part, at least, the same principles of law will be found applicable to both these grounds, and therefore we consider them together.

The principal question, and it is one of much importance, is, what is the extent and operation of the implied contract of the owner, respecting the ability of his ship to carry a particular deck load which he receives on board, under a contract that it shall be carried on deck, dangers of the seas excepted?

In general, the owner warrants the sufficiency of his vessel to carry the cargo put on board by the freighter, provided the vessel be not injured by a peril of the sea. Besides this, he contracts for the use of due care and skill in stowing the cargo and in navigating the vessel.

But, in applying these rules to cargo on deck, some peculiar considerations must be borne in mind.

This bill of lading declares that the property is to go on deck. It excepts perils of the seas. The exception must be construed with reference to the particular adventure, which the contract of affreightment shows was contemplated by the parties. Under this bill of lading the question is, not what in other circumstances could be deemed a peril of the sea, but what is to be deemed such when operating on this vessel, with this deck load. If a very burdensome cargo, like iron, is taken on board, and heavy weather met with, and a jettison made, it would not be a ground of claim against the owner, that the weather encountered would not have been sufficient to justify a jettison if the cargo had been cotton.

And when this freighter consented to place on the deck of this ship his boilers and chimneys, weighing upwards of thirty tons, not distributed about the deck, but lying in a small space, must he not be taken to have known that their necessary effect

might be to embarrass the sailing of the ship in a gale of wind, and cause her to labor in a heavy sea.   The grounds upon which the rights and obligations, as to contribution, of owners of cargo on deck, in case of jettison, have long rested, have an intimate connection with this question.   Valin, lib. 3, tit. 8, art. 12, giving the reason of the rule, that goods jettisoned from the deck are not paid for in general average, but contribute if not thrown over, says : " The reason why articles on deck, thrown overboard or damaged, are not contributed for, is, that as they cannot but embarrass the working of the ship, the presumption is, that they have been jettisoned before a full necessity for a jettison of cargo arose, and only because they hindered and confused the manœuvring of the vessel."

This has been still more clearly expressed by Locré, in his Commentary on the Code du Commerce Maritime, lib. 2, tit. 12, art. 421.   He says : " Perhaps the common safety would not have made a jettison necessary if the lading had not been in contravention of rule, if it had not brought the dangers on the vessel, or contributed to enhance them."   Similar views have been taken by the most approved writers on the law of insurance, in this country and in England, and they have been applied in many cases.   Abbott on Shipping, 481, 490, and notes ; 3 Kent's Comm. 240 ; 2 Phillips on Ins. 71 ; 2 Arnold on Ins. 890.   It was remarked by Lord Denman, in Milward *v.* Hibbert, 3 Ad. & El. N. S. 120, that the reason assigned by Valin, that goods on deck embarrassed the navigation of the ship, is not sufficient to form the basis of a universal rule, excluding goods on deck from the benefit of contribution ; because it may be that, in many cases, goods can best and most safely be stowed on deck ; and that they may, in some cases, be so stowed as not to be in the way of the crew in their operations.   This may be true ; but the point here is, not whether there may be cases in which the deck load does not embarrass the navigation or increase the danger, but whether, in case it does so, the shipper who has consented to his goods being placed on deck, under a special contract, and not pursuant to any general custom, which might be evidence of the safety of the practice, must not be taken to have known that such might be its effects.

It was strongly urged, by the libellant's counsel, that the shipper could not be supposed to have, and should not suffer for not possessing, a knowledge of the capacity or sufficiency of the ship ; that the carrier was bound to know that the instrument, by which he agreed to perform a particular service, was sufficient for that service ; and that, as these carriers contracted to convey this deck load to San Francisco, they were obliged to

10 *

ιscertain whether placing it on deck would overload their vessel. This appears to have been the ground on which the court below rested its decree.

This reasoning would be quite unanswerable, if applied to a shipment of cargo under deck, or to its being laden on deck without the consent of the merchant, or to a contract in which perils of the sea were not excepted. But the maritime codes and writers have recognized the distinction between cargo placed on deck, with the consent of the shipper, and cargo under deck.

There is not one of them which gives a recourse against the master, the vessel, or the owners, if the property lost had been placed on deck with the consent of its owner; and they afford very high evidence of the general and appropriate usages, in this particular, of merchants and ship-owners. Consolato, par Pardessus, c. 186; Ord. de Mer, Valin, lib. 2, tit. 1, art. 12; Code du Com. Mar. par Locré, art. 229, lib. 2, tit. 4, art. 229; Emerigon, ch. 12, sec. 42; Boulay Paty, tom. 4, 566, 568.

So the courts of this country and England, and the writers on this subject, have treated the owner of goods on deck, with his consent, as not having a claim on the master or owners of the ship, in case of jettison. The received law, on the point, is expressed by Chancellor Kent, with his usual precision, in 3 Com. 240 : " Nor is the carrier in that case (jettison of deck load) responsible to the owner, unless the goods were stowed on deck without the consent of the owner, or a general custom binding him, and then he would be chargeable with the loss."

The cases of Smith et al. *v.* Wright, 1 Caines's R. 43 ; Dodge *v.* Bartol, 5 Green. 286 ; Hampton *v.* The Brig Thaddeus, 4 Martin's Lou. R. 582 ; Story on Bailments, 339, sec. 531 ; and Gould *v.* Oliver, 4 Bing. N. C. 142, support this statement. In the last-mentioned case, Tindal, C. J., says: " Now, where the loading on deck has taken place with the consent of the merchant, it is obvious that no remedy against the ship-owner or master, for a wrongful loading of the goods on deck, can exist. The foreign authorities are, indeed, express on that point ; and the general rule of the English law, that no one can maintain an action for a wrong, where he has consented or contributed to the act which occasions his loss, leads to the same conclusion."

It must be admitted, that no one of the authorities referred to go so far as to maintain that the ship-owner contracts no obligation whatever to the merchant, respecting the sufficiency of the vessel to carry the deck load received on board. They should not be understood as supporting such a position. The extent to which we understand them to go, and the law which

we intend to lay down, is this: that if the vessel is seaworthy to carry a cargo under deck, and there was no general custom to carry such goods on deck in such a voyage, and the loss is to be attributed solely to the fact that the goods were on deck, and their owner had consented to their being there, he has no recourse against the master, owners, or vessel, for a jettison rendered necessary for the common safety, by a storm, though that storm, in all probability, would have produced no injurious effect on the vessel if not thus laden. It is not for him to say that, in the first storm the vessel encountered, though not of unusual severity, she proved to be unable to carry the deck load, and so was not of sufficient capacity to perform the contract into which the carrier entered.

The carrier does not contract that a deck load shall not embarrass the navigation of the vessel in a storm, or that it shall not cause her so to roll and labor in a heavy sea, as to strain and endanger the vessel. In short, he does not warrant the sufficiency of his vessel, if otherwise stanch and seaworthy, to withstand any extraordinary action of the sea when thus laden. If the vessel is in itself stanch and seaworthy, and her inability to resist a storm arises solely from the position of a part of the cargo on the deck, the owner of the cargo, who has consented to this mode of shipment, cannot recover from the ship or its owners, on the ground of negligence, or breach of an implied contract respecting seaworthiness. His right to contribution is not involved in this case.

Applying these principles to the case before us, there is no difficulty in coming to a satisfactory conclusion. This vessel was uncommonly stanch and strong. The amount of dead weight on board was not excessive, for there is no pretence that she was too deep in the water. There was no apparent inability to carry the deck load when she sailed, nor until heavy seas were encountered. Her inability to carry these boilers and chimneys arose solely from their particular position on deck.

The libellant, through the shipper in New York, consented to their being placed in this position. He took the risk of their rendering the ship unmanageable in a storm; and he, and not the ship-owners, must bear the loss occasioned by their being placed on the deck, so far as the liability for the loss rests upon any ground of negligence in the place of stowage, or breach of warranty respecting the seaworthiness of the vessel. As to the argument, that there was negligence in not properly stowing and supporting this burden on deck, we think it is not made out in proof. The master is bound to use due diligence and skill in stowing and staying the cargo; but there is no absolute warranty that what is done shall prove sufficient. We are of

opinion that due diligence and skill were used. Besides, we do not find the necessity for the jettison attributable to any defects in these particulars. It may be, that additional supports of the lower deck would have assisted the vessel in bearing the weight, but we see no reason to believe they would have enabled it to carry this unusual burden through a storm; and, therefore, if we found negligence in this particular, we could not declare that the loss was to be attributed to it.

The decree of the district court is to be reversed, and the cause remanded, with directions to dismiss the libel with costs.

### Order.

This cause came on to be heard on the transcript of the record from the district court of the United States for the northern district of California, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said district court in this cause be and the same is hereby reversed with costs; and that this cause be and the same is hereby remanded to the said district court, with directions to that court to dismiss the libel with costs.