## THE WORDSWORTH.

(District Court, S. D. New York. April 6, 1898.)

GENERAL AVERAGE—APPARENT DANGER—OPENING SLUICES—DAMAGE TO CARGO.

Voluntary damage to cargo to avoid an apparent danger menacing both ship and cargo is sufficient to support a general average. At sea the W.'s fore-peak was found suddenly filled with water, believed by the master and officers to come from a hole below the water line, which, if true, would prevent the voyage from being prosecuted, as ship and cargo would be in danger. To make the necessary examination of the fore-peak, the sluices were opened to the next compartment, and the water allowed to run through it, and some flour stowed there was necessarily damaged thereby. The leak was by that means discovered to be in the hawse pipe only. It was repaired, and the voyage proceeded with. *Held*, that the water damage to the flour was a proper general average charge.

Evarts, Choate & Beaman (Harrington Putnam, of counsel), for libelant.

Owen & Sturges, for claimant.

BROWN, District Judge. The above libel was filed to enforce a claim for general average contribution, on account of the alleged sacrifice and damage of the libelant's cargo to the amount of $3,500, on board the steamship Wordsworth, upon a voyage from New York to Rio de Janeiro in October, 1895. The answer, while admitting the loss and the damage, denies that the loss was incurred for the safety of the ship and cargo, or that it was a proper subject for a general average contribution.

The libelant's cargo consisted of flour, of which 4,000 barrels were stowed in the forward No. 1 hold. The steamer left Sandy Hook about noon on October 12, 1895. She soon met a heavy and confused sea, lasting a day and a half, and shipped much water over her bows. At 5 o'clock in the afternoon of October 13th, the carpenter reported the fore-peak full of water. This compartment held 150 tons. It had filled some time after noon of that day, when it was examined and found dry. On immediate inspection of the ports, none were found broken, and no cause for the heavy leak could be discovered. The

master consequently formed the judgment that a hole had been stove in forward. He testifies that at that time there was a "strong southeast wind, half a gale. We had, he says, a heavy cross sea and I was nearly paralyzed, knowing that my ship was in good condition when we left. I was perfectly satisfied that there was nothing more that mortal man could do to make her more perfect. I said to myself, it must be below the water, the damage. I then said to myself, knowing that the upper part of the vessel was in a good condition, if it is, as I suppose, a hole below, I must open all the sluices and let the water run to the engine room where they have powerful pumps, and put back to New York."

The sluices of the collision bulkhead were accordingly opened, as there was no other possible method of getting the water out of the fore-peak. The consequence of opening these sluices was that, although the pumps in No. 1 compartment were kept working, about a foot of water unavoidably accumulated in that compartment, where the libelant's flour was stowed, and the damage in question was thus incurred. The master knew when he ordered the sluices opened, that some water damage would be thus caused; but believing that there was a hole forward, he considered that the safety of the ship required this to be done as "the only way to save the ship," as he stated on his first examination. He then further stated that with this amount of water in the fore-peak, and the ship plunging in heavy weather, the collision bulkhead, he thinks, would have carried away; and the ship with a hole forward as he then believed, "would have been in great danger." There can be no doubt that he supposed the leak had arisen from a hole forward. It was under such circumstances, and upon that judgment formed at the time, that this damage was voluntarily incurred by opening the sluices.

When the water by this means had been reduced in the fore-peak sufficiently to allow persons to go down and examine in the inside, it was found that the leak arose from a break in the port hawse pipe, and this break was soon repaired. The master in his testimony accordingly adds:

"Then there was no necessity to open the sluices and let the water go into the engine room, and I could have proceeded to Brazil in that condition, provided the bulkhead had held on. It might not in the swash of the sea."

Although the officers, when subsequently testifying in the present case, stated that the safety of the ship was not in fact involved, and that the only result of the breaking down of the collision bulkhead, if the water in the forepeak had not been lowered, would have been merely greater damage to the cargo in No. 1 compartment, yet it is plain that this testimony is all based upon the facts ascertained after the act of sacrifice had been done and the loss incurred; and that the facts could not have been ascertained except by means of that very act of sacrifice, nor could the vessel have been put into such a condition of apparent safety as would permit the prosecution of the voyage. The first officer says that, if master, he "would not have proceeded on the voyage without finding out where the break was"; and that there was no other way of finding out than by opening the

sluices. The opening of the sluices was, therefore, a necessary condition of any further prosecution of the voyage, and the loss attending that act was a sacrifice in the interest of all concerned. The judgment formed at the time when the act was done as respects the danger to all, and the necessity of opening the sluices very clearly appear not merely from the master's first testimony above referred to, but also in the final testimony of the first officer, who states distinctly: "I supposed it would be for the safety of the ship; but not as it proved afterwards."

In other words a situation of imminent danger to the whole enterprise was believed to exist, and did apparently exist, such as apparently required this sacrifice to be incurred; and it was upon that judgment and belief that the sacrifice was made, and made, as supposed and understood at the time, necessarily in the interest and for the safety of all concerned.

This is sufficient to support a general average charge, where the judgment of the master was in good faith, as is here evident, and was formed upon reasonable grounds. In such cases the master, as the authorized agent of all interested in the adventure, acts in behalf of all, and binds all to contribute for the sacrifices made for the common benefit, even though his act may turn out to be a mistake. This principle was unequivocally declared by the supreme court, as respects a jettison, in the case of Lawrence v. Minturn, 17 How. 100, 110. In Hobson v. Lord, 92 U. S. 397, 403, it is also said that all interests are bound to make contribution "if it appears that the expenses or sacrifices were induced or occasioned by an impending peril apparently imminent."

Other instances of the application of this principle are the allowance of a general average charge for a jettison made through apprehension of an enemy mistakenly supposed to be bearing down upon the vessel; or for a voluntary stranding resorted to in order to avoid an apprehended greater disaster just before a sudden and unexpected cessation of a storm, so that the stranding was in fact unnecessary, though at the time judged by the master to be necessary. The doctrine above set forth is sustained also by the general authorities (Dix. Ins. 121–123; Gourl. Gen. Av. 11, note), and requires the allowance of a decree for the libelant with costs.