## THE NIDARHOLM.

District Court, D. Maine, S. D. May 21, 1928.

No. 1122.

1. **Shipping** ⟜132(5⅜)—Evidence held to establish that loss of deck cargo of pulpwood resulted solely from ship's unseaworthiness as improperly loaded under master's direction.

In action to recover damage for loss of part of cargo of pulpwood on deck of steamer chartered for purpose of carrying such pulpwood under a charter requiring charterers to load, stow, and trim cargo under supervision of captain, evidence *held* to establish that loss of deck cargo resulted solely from unseaworthiness of ship as improperly loaded under master's supervision.

2. **Shipping** ⟜121(2)—"Seaworthiness" Includes not only fitness in respect to hull, machinery, and equipment, but also with respect to stowage of cargo.

Under the doctrine of the maritime courts, "seaworthiness" includes not only fitness in respect to the hull, machinery, and equipment, but also with respect to the preparation for and stowage of cargo.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Seaworthy—Seaworthiness.]

In Admiralty. Libel by the Oxford Paper Company against the steamship Nidarholm, wherein respondent filed a cross-libel. Decree for libelant and dismissing the cross-libel.

Woodman, Whitehouse, Skelton & Thompson, of Portland, Me. (Nathan W. Thompson, of Portland, Me., of counsel), for libelant.

Goodwin, Procter, Field & Hoar, of Boston, Mass. (Robert R. Duncan, of Boston, Mass., of counsel), for claimant.

HALE, District Judge. This is an action in rem, brought by the Oxford Paper Company against the Norwegian steamship Nidarholm, to recover damages for loss of part of a cargo of pulpwood from the deck of the steamer. The owners of the Nidarholm appeared, filed a claim and bond to release the steamship from arrest, and afterwards filed a cross-libel against the Oxford Paper Company to recover for damage to the ship by reason of the pulpwood striking the side of the ship as it went overboard. Both actions arose from the same facts.

The case shows that the Oxford Paper Company has for a long time been chartering Norwegian steam vessels for the purpose of carrying pulpwood from its plant in Murray, Nova Scotia, to Portland, Me., from which point it is distributed to various mills in Maine.

In May, 1927, a written charter party between the libelant and the owners of the Nidarholm provided that the libelant should have the entire use of the steamship for a period of three months, in consideraton of the payment of $1.55 per D. W. ton per month. Among other things in the charter party, it was agreed:

"Charterers to have liberty to sublet the steamer for all or any part of the time covered by this charter, but charterers remaining responsible for the fulfillment of this charter party. Steamer to be placed at the disposal of the charterers, at Camden, New Jersey, in such dock or at such wharf or place (where she may always safely lie afloat, at all time of tide), as the charterers may direct,

and being on her delivery ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the service, having water ballast, steam winches and donkey boiler with capacity to run all the steam winches at one and the same time, and with full complement of officers, seamen, engineers and fireman for a vessel of her tonnage."

It was further provided:

"8. That the captain shall prosecute his voyages with the utmost dispatch, and shall render all customary assistance with ship's crew and boats. The captain (although appointed by the owners) shall be under the orders and direction of the charterers as regards employment or agency; and charterers are to load, stow and trim the cargo at their expense under the supervision of the captain, who is to sign bills of lading for cargo as presented, in conformity with mates' or tally clerks' receipts."

In accordance with the charter party, the Nidarholm was turned over to the charterer at New Jersey, and ordered to Hampton Roads, Va., to load a cargo of coal for Port Alfred, P. Q. She proceeded to Hampton Roads, took on a cargo of coal, and then started for Port Alfred to discharge.

It appears from testimony and from the logbook of the ship that on the trip from Hampton Roads to Port Alfred the Nidarholm went ashore and was stranded for at least four days, during which time it was necessary to lighter a large part of her cargo, to run anchors out for the purpose of hauling the vessel off, and to use the vessel's cables and lines in order to run a long hawser to a towing vessel, which was finally necessary to remove the vessel from the place where she was stranded.

After the ship was refloated, she was taken to Port Alfred, where she discharged her cargo; thence she went to Quebec, where she was drydocked for about nineteen days and had her bottom repaired.

After being repaired, the ship left Quebec and arrived at the libelant's plant at Murray, for the purpose of loading a cargo of pulpwood for Portland.

The ship was prepared for loading by first placing stanchions, approximately 20 feet long and 8 to 10 inches through the butt, around the deck at the rail, at distances of approximately 4 or 5 feet apart, for the purpose of holding the deck cargo. These stanchions were held in place by wire rope lashings running from ring bolts in the hatch combings to about the center of the stanchions. The wire lashings supported the stanchions at a point about 6 or 7 feet above the ship's rail or 10 to 11 feet above the deck; above that point the stanchions had no support. It is claimed in testimony by the libelant that this method of holding the deck load had been adopted by libelant ever since it commenced transporting pulpwood from Murray to Portland. Several hundred thousand cords had been transported with the deck load secured in this manner. The cargo consisted of 1,575 cords of pulpwood logs. The logs were round, cut into 2-foot lengths, and varied in diameter from 4 to 18 inches. They were loaded through chutes running out over the deck of the ship.

The holds of the vessel were first loaded with pulpwood; then the deck cargo, held in place by the stanchions, was put on board. The trip on which the loss occurred was the second trip that the Nidarholm had undertaken in this service, and the deck load at the time the Nidarholm started was approximately 17 feet high. The loading was done under the supervision of the master of the Nidarholm.

When the ship left the dock, she had a starboard list of about 5 degrees; while she was backing away she would come to an even keel, and then drop back to her starboard list. After the backing movement had been completed, she came up on an even keel, slowly listed over to port, and proceeded to sea. As she went down the harbor, the port list gradually increased until she was listing between 10 and 14 degrees to port, when she was less than one-half hour away from her loading berth and in practically smooth water. Each movement of her helm caused the list to increase or decrease according to her course, and, shortly following one helm movement, she listed to port to such a degree that part of her deck cargo went over the port side. When she was lightened of part of her deck cargo, she whipped sharply back to starboard, and listed to starboard so much that her officers feared she would go over completely. After cleaning off the cargo on the starboard side, she again listed back to port, and cleaned off the balance of the deck cargo above the rails. The pulpwood, something more than 300 odd cords, was carried to sea by the ebb tide then running.

The answer by the claimant alleges the causes of the loss to have been:

"1. The deck cargo was improperly and negligently loaded, stowed, trimmed, and secured by the libelant.

"2. The stanchions supporting the deck cargo were of balsam spruce, a wood of insufficient strength to be put to such use, and

said stanchions were weak and not fit for the use to which they were put.

"3. The said stanchions were improperly set up, in that they were placed at too great an interval from each other.

"4. The deck cargo was not properly secured to withstand the ordinary strains of navigation.

"5. And other respects to be shown at the trial."

I think it unnecessary to conclude how far the answer should be held to be admissions of the liability of the ship. I prefer to decide the case upon the testimony presented. [1] In behalf of the ship, it is contended that the loss was due to the breaking of the cribbing constructed by the charterer in accordance with its duty under the charter party; that the cribbing broke before the ship had heeled to half the extent that was reasonably to be expected; and it is alleged that the charterers were responsible for the stanchions and the cribbing, under the agreement of the charter party, even if the loading was to be done under the supervision of the captain. It is pointed out that, on the first trip of the ship from Murray to Portland, she carried a deck cargo about the same in character as that carried on the second trip, except that on the latter trip the cargo was wet and somewhat heavier; that the first trip was made without loss, and that when the first cargo was discharged at Portland the stanchions and cribbing were left standing, as she proceeded without any cargo back to Murray; that on the first trip the ship had a 5-degree list to starboard when she left the dock, but, when she turned around in the stream and felt her helm, she straightened up and gradually took a 5-degree list to port; that the list increased as the ship went down the channel and over the shallow bar at the entrance to the harbor, but on reaching open water she came back to a 5-degree list, which was carried all the way to Portland; that as she left the dock on the second trip, the steamer behaved precisely as she had done on the first trip; she straightened up as the turn of the stream was made, and then sagged down slowly to a 5-degree list to port, but the 5-degree list continued until she reached the bar at the mouth of the bay, when the list to port increased to about 10 to 14 degrees, either because she smelled the bottom or because of a change in helm; she held the increased list for a short time, when the captain heard a "crack" forward, and soon after all the stanchions on the port side broke and about half the deck load on the forward well deck went overboard; that

at no time prior to the time when the first section of the cribbing broke did the steamer list as far as she might be expected to roll by action of the sea during the course of the voyage, and not as far as she had rolled on the first trip; that, although the ship was "tender" after her loading was completed, such tenderness did not render her unseaworthy for such a voyage, and was not the proximate cause of the loss; that the condition of "crankiness" did not render the ship unseaworthy for the voyage, but when the cargo went overboard all the stanchions in that section of the cribbing broke.

The learned proctor for the ship contends that the captain was fully justified in assuming that his deck cargo was secured to withstand the ordinary perils and adventures of the voyage; that he had a right to assume that the cribbing was strong enough to meet all ordinary contingencies; that he was confirmed in this belief by the fact that this cribbing had adequately supported the deck cargo on the first trip to Portland; and that, in view of the provisions of the charter party which required the charterer to load and stow the cargo, and in view of the fact that the cribbing was constructed by a civil engineer employed by the charterer, and that the loading and stowage were under the supervision of the charterer's boss stevedore, McAulay, who had loaded between 100 and 125 ships for deck cargo in a similar manner, the captain was fully justified in assuming that the erection of the cribbing and the loading and stowing of the cargo, were properly done. [2] The charter party provides that the "charterers are to load, stow, and trim the cargo at their expense, under the supervision of the master." It provides also that the ship should be, "on her delivery, ready to receive cargo, with clean-swept holds and tight, staunch, strong, and in every way fit for the service." There was an affirmative warranty of seaworthiness on the part of the ship, in addition to the implied warranty of seaworthiness in every contract that a ship makes for her voyage. Under the doctrine of the maritime courts, seaworthiness includes not only fitness in respect to the hull, machinery, and equipment, but also with respect to the preparation for and stowage of the cargo.

In Corsar v. Spreckels & Bros. Co., 141 F. 260, 264, speaking for the Circuit Court of Appeals in the Ninth Circuit, Judge Ross said: "Indeed, unless otherwise expressly stipulated, an implied warranty of seaworthiness of the ship at the time of commencing the voyage accompanies every contract of affreightment. The Caledonia, 157 U. S. 130,

131, 15 S. Ct. 537, 39 L. Ed. 644. And this includes, not only a ship seaworthy in hull and equipment, which conditions it is conceded the Musselcrag met, but also seaworthy in respect to the stowage of the cargo." This case is cited in Harloff et al. v. Barber & Co., 150 F. 185, in which case Judge Adams in the District Court said:

"The duty is upon the owner of a ship to render her fit in design, structure, condition and equipment to encounter the ordinary perils of the voyage and to be fit for the receipt and carriage of a special cargo. Carver on Carriage by Sea, §§ 18, 19a, 20. It is also said by the same author (section 273): 'The duty of stowing the cargo in the ship lies on the owner, and on the master as his representative, unless there is an agreement to the contrary. The master ought to be a competent stevedore, and he must see that the stowage is done with skill and care. * * *. Moreover, the ship must provide whatever dunnage may be required * * * such as mats, battens, loose wood, etc. These are needful to keep the goods in their places. * * * ' A chartered vessel in the absence of a special agreement, is required to supply herself with proper fittings for the carriage of lawful cargo. Dene Steam Shipping Co., Ltd., v. Tweedie Trading ·Co. (D. C.) 133 F. 589; Id. (C. C. A.) 143 F. 854."

Poore on Charter Parties, § 3:

"The seaworthiness of the ship is under the absolute control of the master. Neither he nor his owners are excused because the charterers load the ship in such a way as to make her unseaworthy."

In Olsen v. United States Shipping Co. (C. C. A.) 213 F. 20, Judge Ward said:

"The charterer loaded timber on deck both forward and aft. The after deckload was lashed by the crew but the loading of the forward deckload was not completed before dark, so that it could not be lashed that day. The charterer was anxious to have the steamer leave on the morning tide for Ship Island, to save a day, there being but one tide a day in the Gulf. The master accordingly moved the steamer astern to pick up her after anchor, without waiting to lash the forward deckload and in backing she struck the side of the bank. Some of the wooden uprights on the port side, fixed to keep the deckload in place, broke and twenty logs were thrown off. A survey was held which recommended that 279 more logs be discharged and the whole 299 logs rafted to Ship Island, to be reloaded there. The District Judge held that the expenses connected with the falling of the deckload at Gulfport should be divided between the owner and charterer, the former being at fault for not lashing the deckload and the latter for loading it. We think that it is chargeable to the owners only because the master should not have started to Ship Island until he had secured the forward deckload. The accident was not due to the striking of the bank, but to the fact that the vessel was unseaworthy as to her forward deckload, a thing which it was the duty of the master to prevent. * * *

"It is true that when charterers load cargo against the protest of the master in such a way that it is itself damaged and/or damages other cargo, the charterer will be liable. The Centurion (D. C.) 57 F. 412. Likewise, when cargo loaded on deck by agreement is lost because of a peril of the sea the ship will be excused. Lawrence v. Minturn, 17 How. 100, 15 L. Ed. 58. We are not willing to extend this to such a loading as makes the ship herself unseaworthy when no sea peril is encountered. It would, in our opinion, be unwise and dangerous to impair the implied warranty of seaworthiness of the ship herself. The district judge rightly held that the steamer was unseaworthy on leaving Ship Island. The jettison was caused not by sea peril, but by her own instability. It makes no difference whether this was due to the amount or the stowage of the deckload alone or also to the fact that the largest ballast tank could not be filled. All these matters were under the absolute control of the master and it was his duty to see that they were right. It was no excuse to him that the charterers did the loading; insisted upon his taking the deckload or that surveyors certified that the ship could do so safely. No doubt both thought so. That, however, did not lessen his duty, especially in view of the fact that he did not think so himself."

In Knohr & Burchard v. Pacific Creosoting Co. (D. C.) 181 F. 856, 858, the court said:

"It is claimed, however, that the ship and owners were relieved from responsibility for bad stowage, by reason of the facts that the charter party provides that Messrs. Andrew Weir & Company should have the nomination of the stevedore to stow the cargo, and that said firm did select the stevedore. The mere selection, however, of the stevedore did not deprive the captain of his authority to control the operation of loading, and to insist upon stowage satisfactory to him, and the evidence proves that the stevedores worked under the supervision of a marine surveyor employed by the captain and that the system of stowing between decks was agreed

to by the captain, his marine surveyor, the stevedore and a representative of Andrew Weir & Co. This evidence certainly leaves the responsibility for stowage upon the captain of the ship where it usually rests." The Dana [D. C.] 190 F. 650.

In the case before me, under the rules of maritime law, I find nothing in the proofs which excuses the captain for putting to sea in an overloaded vessel; and it is clear that no ship is seaworthy unless her deck cargo is properly stowed, and unless the stanchions supporting it are of sufficient strength and properly placed, and the cargo properly secured. The captain is presumed to be responsible for the ship without any express provision in the charter; and here there is an express provision in the charter giving him the supervision of the loading.

The proofs show that the master and mate saw the stanchions and found no fault with them; that the lashings were furnished by the ship and put on by the ship's crew. It appears in evidence that the superintendent in charge of the plant at Murray recommended to the master that he put an athwartship lashing at the foremast, the same to go around the foremast and be made fast on the stanchions opposite the foremast. This lashing the captain refused to use on his first trip. It appears that the suggestion was renewed by the libelant's superintendent on the second trip, and the captain again refused to put it on; and it was on this trip that the loss occurred. It appears that on the third trip the lashing was put on.

It appears that the same stanchions, used at the time of the loss, were used on the trip previous, without trouble; that the stanchions were in place when the ship returned from Portland to Murray at the end of the first trip; that during all this time the master and mate had a chance to examine, and did examine, the stanchions; and the master says, "If I had seen that there was anything untoward in the loading of the ship, I would have protested."

The proofs are clearly persuasive that the captain exercised his duty of supervision. During the night the stevedore, McAulay, was left in charge, with instructions to call the captain at 4 in the morning; but, in loading, the list had become so great that the stevedore called the captain before 4 o'clock. The master came on the bridge in his nightclothes and gave orders with reference to the loading, conferred with and directed the chief engineer, and, at the request of the stevedore, the master stayed on deck until the loading was completed. There is evidence tending to show that the captain might have been encouraged by the fact that, on the first voyage, the ship had proceeded in safety with almost as much tonnage on deck as she had on the second trip, and that, although she listed very heavily, she came to Portland in safety. He says that he ordered the cargo trimmed, and when she left the dock she was drawing 19 feet 4 inches forward and 21 feet 5 inches aft. She was 2½ inches below her load marks. Without going into more details of loading, it appears from the captain's testimony that the ship in calm weather and smooth water, while still within the harbor limits, was listed to her maximum angle of safety, and according to Carmichael, a disinterested witness, she was exceeding her angle of safety by 3 or 4 degrees. At every movement of the helm after the vessel left the dock up to the time of the loss her list changed materially, and, immediately following a sharp movement of the helm, the cargo went off the port forward deck, abreast the foremast, at the place where the athwartship lashing proposed by the libelant should have been. It seems clear to me, even if the breaking of the stanchions and the lashing was the immediate cause of the cargo going over the rail, that the list of the vessel was caused by her overloaded condition, over which the captain must be held by law and in fact to have been responsible. The captain seems to have been unduly encouraged by the fact that he had got safely to Portland on another trip when the ship had listed even more than on this trip; but he admits that the cargo on this trip was somewhat heavier than on the previous trip.

From the action of the ship in smooth water, I cannot escape the conclusion that she was unfit to face the perils of the sea along the exposed area of the Atlantic Coast from Murray to Portland. One of the ship's disinterested witnesses testified that the ship's actions indicated "crankiness," and that by crankiness he meant being "topheavy," and the pilot testified:

"Q. 71. Now, whether or not in your opinion, based on your observations on the morning that you piloted the Nidarholm down when this loss occurred, in your judgment that ship would have reached Portland harbor with that deck load on her? A. Well, I don't think she would.

"Q. 72. You don't think she would? A. No.

"Q. 73. And why not? A. On account of the list she had.

"Q. 74. Have you, in your experience in piloting vessels over these same waters, with

this same kind of cargo, seen vessels act the same as the Nidarholm did at that time? A. No, sir.

"Q. 75. You never did? A. No, sir."

Upon the proofs I think the master cannot escape liability from the fact that the loading was done by the charterers. It was done under the supervision of the captain; and the cases make no different rule where the charterers are also the owners, as in the instant case.

In the Olsen Case, supra, the Circuit Court of Appeals for the Second Circuit went so far as to hold an implied warranty of seaworthiness of the ship in a case where the charterers did the loading and insisted upon the master's taking the deck load which afterwards had to be thrown over on account of its not having been secured properly before the ship sailed. And in that case one of the surveyors had certified that the ship could take the deck load in safety. The court held that these facts did not lessen the master's duty even if the master himself had thought that the deck load was not sufficiently secure, but had yielded to the charterers.

The learned proctor for the ship cites two cases which he contends to be decisive that the charterers, not the ship, should be held liable for bad stowage in the instant case.

In The Thomas P. Beal, 11 F.(2d) 49, 52, the court had before it an action to recover for the loss and damage to barrels of oil, a part of a mixed cargo. The loss occurred by reason of the charterer loading the barrels of oil in a part of the ship that was too warm for the cargo. Speaking for the Circuit Court of Appeals in the Third Circuit, Judge Woolley said:

"On the issue of liability for bad stowage, as between the time charterer and the shipowner, the time charterer relies mainly on cases which hold generally, and very properly, that responsibility for the seaworthiness of a chartered ship is on the shipowner"— citing many cases.

"But that, generally, means responsibility for seaworthiness of the ship as against perils of the sea; it does not, in every instance, mean responsibility for her seaworthiness in respect to stowing cargo."

The court then discusses at some length the facts in the case, and shows that the charterer booked the freight, designated places of stowage, did the stowing itself through its own stevedores, and "assumed all responsibility therefor." In that case the stowage of the cargo had nothing to do with the ship's seaworthiness, as it did in the instant case.

In the case before me, the charter affirmatively makes it the duty of the master to supervise the loading and stowing, and the proofs show that he did actually attend to such supervision.

In The Santona (C. C.) 152 F. 517, 518, Judge Hough, then District Judge in the New York District, had before him a case where action was brought by the shipowners to recover for charter hire. The charterer attempted to offset the claim for hire by claiming a short delivery on some of the cargoes. The question was whether the mate was the agent of the ship or of the charterer. Judge Hough said:

"Nor is there any difficulty in formulating the consequences flowing from a letting of the ship, as distinguished from a contract for her services. In the former case, the relation between owner and charterer becomes that of bailor and bailee; whereas, in the latter, the relation is that of shipper and carrier. Carver (4th Ed.) § 112; The Barnstable, 181 U. S. 469, 21 S. Ct. 684, 45 L. Ed. 954. The difficulty lies, not in the statement of the rule or the recognition of the consequences thereof, but in its application to the infinitely varying circumstances of contract between shipowners and charterers. It appears to me that the best test of the applicability of the rule to any given state of facts is to inquire whose were the agents who wrought the injury out of which the controversy in hand arose. It is the same inquiry put by Lord Esher, in 1 Q. B. 258: 'When is the captain the owner's captain?' That question, as applied to this case, is: Was the mate, when tallying cargo, the owner's mate? And the answer to that question must be ascertained by considering the provisions of the charter party affecting the receipt, carriage, and delivery of cargo as between owner and charterer.

"Under the very ordinary form of time charter involved in this cause, it shocks knowledge common to all men acquainted with maritime business to say that the owner has surrendered the possession or control or command or navigation of his ship. But he has surrendered control of her freight and passenger capacity and handed the same over to the charterers for all lawful purposes. The ship is the owner's ship, and the master and crew his servants for all details of navigation and care of the vessel; but for all matters relating to the receipt and delivery of cargo, and to those earnings of the vessel which flow into the pockets of the charterers, the master and crew are the servants of the charterers. There is, in fact (to borrow a

simile from another branch of the law), an estate carved out of the ship and handed over for a specified term to the charterer, and that estate consists of the capacity of the vessel for carrying freight and earning freight moneys, and the use of the vessel, master, and crew, for the advancement of the charterers' gains. It follows that, when the mate was tallying cargo, he was the charterers' mate, and the set-offs for shortage claimed by the respondent are disallowed."

I have quoted quite fully from Judge Hough because he shows the difficulty of applying the rule between charterers and owners "to the infinitely varying circumstances of a contract between shipowners and charterers."

In the case before me, there was "an estate carved out of the ship and handed over for a specified term to the charterer." The ship was placed at the disposal of the charterers; and the captain was under the direction of the charterers for certain purposes. But the charterers were to load "under the supervision of the captain, who is to sign bills of lading for cargo as presented in conformity with mate's or tally clerk's receipts," and, as has already been found, the captain did affirmatively superintend the stowage and decided as to the details of the loading.

In view of the language of the charter in the instant case, and of all the testimony, I am constrained to find that it was the duty of the shipowner to have the ship seaworthy at the commencement of the trip, in hull, equipment, and also in the preparation for and stowage of the cargo; that this duty rested on the master; that, under the doctrine of the leading maritime cases, the master cannot excuse himself by the provision of the charter that the loading should be done by the charterers "under the supervision of the captain." The proofs show that the master did not intend, or attempt, to delegate his duties with respect to the loading; he personally supervised and "bossed" the loading, trimming, and securing of the cargo. Even if the charterers furnished the stanchions which broke under the strain, clearly the charterers were obliged to furnish only such stanchions as would withstand a seaworthy ship, and not a ship unseaworthy by reason of being overloaded. The stanchions furnished were used on previous trips without trouble, and, from the proofs, I see no reason to find that they would not have resisted any strain brought upon them in a properly loaded ship. I think the loss was occasioned solely by reason of the ship being overloaded, with a deck cargo improperly stowed, under the supervision of the master.

The cross-libel is dismissed, with costs. A decree may be entered for the libelant in No. 1132, with costs.

The case is referred to George F. Gould, Esq., and Albert B. Hall, Esq., assessors, to determine damages.