DENE STEAM SHIPPING CO., Limited, v. TWEEDIE TRADING CO.

(District Court, S. D. New York.  November 3, 1904.)

1. SHIPPING—CHARTER HIRE—IMPROPER FITTINGS FOR CARRIAGE OF ASPHALT.
    A ship chartered for a voyage to South American ports, which went to Trinidad, by the charterer's direction, and without objection, to load a return cargo of asphalt under a subcharter, was bound to furnish the special lining required for such cargo to prevent it from getting behind the permanent battens with which she was equipped; and, where such

lining was not provided, she is liable for the expense of taking off the battens and removing the asphalt behind them; the cargo being a lawful one, and the charter containing no special provision exempting the vessel from the duty imposed generally of providing proper equipment and fittings for the service.

In Admiralty. Suit to recover charter hire.

Convers & Kirlin and Charles R. Hickox, for libellant.

Wheeler, Cortis & Haight, for respondent.

ADAMS, District Judge. This action was brought by the libellant, the Dene Steam Shipping Company, Limited, owner of the steamship Myrtledene, to recover a balance of charter hire, amounting to $2,-486.70 claimed to be due from the Tweedie Trading Company under charter dated December 10, 1902, and a continuation thereof dated March 31, 1903. There is no dispute as to the correctness of such amount and the fact that it has not been paid, but the respondent claims that it has offsets amounting to $2,180.95.

These offsets arise out of various expenses incurred by the respondent in connection with the charter of December 10, 1902. All the claims now insisted upon by the respondent were, it is said, covered by a clause in the continuation of the charter as follows:

"Whereas the owners have presented notice to the charterers that owing to steamer not having proceeded to South America on previous charter, they hold them liable for damages, now in consideration of the execution of this charter on the part of the charterers the owners agree to waive said claim, and they also for said consideration agree that they allow the carriage of asphalt on previous charter and on this charter (the charterers of course contending that they had this right anyway) and the owners agree to waive their claim for damages incurred by the steamer in fitting up for asphalt & in repairing damages done to the steamer and for any loss of time incurred by the steamer in repairing said damage."

The claimed offsets are:

"Disbursements at Point La Brea in strengthening bulkhead, including cables and cash to Master............................$  260.44
Disbursements at Phila. in tearing out battens and replacing same, and removing asphalt behind them and behind wooden bulkhead ...............................................   942.16
Proportionate amount of hire while Phila. work was being done..   983.26
                                                              _____
                                                              $2,180.95"

The first charter provided for a "round trip to South America, not south of River Plate, option of West Indies en route." The steamship was delivered to the respondent thereunder at Norfolk, Virginia, February 9, 1903, at 9:30 a. m. and she was first ordered to carry a load of coal thence to Port of Spain, Trinidad, which she did. At this port the steamer was ordered to Point La Brea, Trinidad, by the respondent to carry out a sub-charter, dated February 11, 1903, with the New Trinidad Lake Asphalt Company, Limited, which provided for the transportation of a part of a cargo of asphalt from Point La Brea to Philadelphia.

Trinidad asphalt is of a viscous nature for which vessels were often lined throughout, for the double purpose of facilitating the unloading and preventing the cargo from sticking to the permanent structure of

the vessel. The printed form of the sub-charter contained a provision "(9) Steamer to line to carry asphalt at her own expense." This clause was stricken out before the execution of the instrument. No lining was provided for the vessel, nor was there any dunnage on board which could be used for such purpose. The vessel had permanent battens and when she was discharged in Philadelphia, the stevedores declined to remove that portion of the cargo which had gone behind them without extra compensation to cover the additional expense, with the result that the battens had to be removed subsequently by the charterer at considerable outlay.

The question presented for consideration is upon whom it was incumbent to furnish lining to prevent the asphalt from sticking to the sides of this ship. Formerly it was necessary to line all ships to prevent asphalt damage, Dene S. S. Co. v. Munson (D. C.) 103 Fed. 983, 985. Prior to the steamer's departure from Norfolk, the president of the respondent wrote to the master, under date of February 12, 1903, as follows:

"In the asphalt charters in old times the shippers used to insert a clause in the charter compelling the steamer to line the steamer's holds with lumber at her expense, but recently they waive this clause as they find it not necessary to have the steamer lined, and in this case the clause requiring the steamer to line at her expense is stricken out. So if they should require the steamer to line serve them notice that the cost of same & the steamer's time lost while so doing is for their account. So far as we are concerned of course we have no objection to your using your dunnage for a lining if you desire, but as we understand it is not usually done now we see no necessity for it."

The evidence in this case shows that the use of lime often suffices to prevent damage and had the vessel been thoroughly whitewashed, i. e. behind the battens as well as elsewhere, it is probable that no damage would have ensued from the loading. The master was not aware of the danger of an asphalt cargo. In any event, the thorough whitewashing that was necessary was not practicable here on account of the permanent battens and about 50 tons of asphalt remained principally behind them and partly behind a wooden bulkhead built against the next row of beams immediately forward of one of the iron bulkheads. The No. 2 cross bulkhead was broken by the asphalt, some stanchions were bent and a beam was twisted. The master of the steamer repaired the bulkhead and stanchions while the cargo was being discharged but that part of the asphalt behind the battens remained at the time but was afterwards removed by the respondent and it now seeks to charge the cost against the owner, having deducted a sufficient amount to cover the expenses from the hire. The remaining asphalt was a source of danger to other cargo in hot climates and its removal was imperative to put the vessel in condition to secure another charter.

There was no provision in the contract for the carriage of any unusual cargo requiring special fittings for its transportation. With respect to the furnishing of necessary things for the steamer, the charter provided:

"1. That the Owner shall provide and pay for all provisions, wages and Consular shipping and discharging fees of the Captain, Officers, Engineers,

Firemen and Crew; shall pay for the insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, and maintain her in a thoroughly efficient state in hull and machinery for and during the service.

"2. That the Charterers shall provide and pay for all the Coal, Port Charges, Pilotages, Agencies, Commissions, Consular Charges (except those pertaining to the captain, officers or crew), and all other Charges whatsoever, except those before stated.

"Charterers are to provide necessary dunnage and shifting boards, but Owners to allow them the use of the dunnage and shifting boards already aboard the Steamer."

It is now settled that asphalt is a lawful cargo, Dene S. S. Co. v. Munson, supra, and it was incumbent upon the ship to provide the necessary fittings so as to render her seaworthy when she was about to engage in a trade, which called upon her to carry it. The first charter did not specifically provide that she should go to Trinidad but she went there under the charterer's order without objection or protest. The possible carriage of asphalt, which is the principal article of export from that island, must have been in contemplation at the time she went, or, if not, then it is evidently within the special marginal agreement, which seems to indicate an intention that the vessel should assume the burdens incident to such a trip. It was apparently the owner's duty to make her fit and seaworthy in such respect, which, in view of the permanent battens, required special lining to prevent the asphalt from getting behind them. The sending of the vessel to Trinidad was a matter of dispute between these contending parties but when the continuation of the existing charter, or new charter, was arranged, any claim which the owner may have had in consequence of the Trinidad voyage was waived and the owner also agreed to waive a claim for damages and expenses, which it supposed it had but did not actually have because there were no damages and the charterer had paid the expenses. The agreement provided for the carriage of asphalt on the first as well as the new charter and it is not easy to see how the owner can justly escape the payment of the expense caused by the lack of proper fittings. It seems just as much within the final intention of the parties as the matters specifically covered by the special agreement.

The libellant is apparently entitled to some hire above the respondent's disbursements incurred in removing the asphalt and in replacing the battens and wooden bulkhead. The steamer should be considered off hire while the work was being done, for which the respondent should also have credit. To arrive at a correct result, the services of a commissioner are necessary. The question of costs will await the coming in of his report.

Decree for the libellant, with an order of reference to ascertain the extent of its recovery after deducting the respondent's necessary outlays as above indicated.