TWEEDIE TRADING CO. v. DENE STEAM SHIPPING CO., Limited.

(District Court, S. D. New York. October 9, 1905.)

1. SHIPPING—CHARTER PARTY—DELAY IN DELIVERY OF VESSEL.

The owner of a vessel is not liable to a charterer for delay in delivering the vessel, owing to the making of repairs rendered necessary by her stranding while on the way to the port of delivery, where good faith and reasonable diligence were shown in prosecuting the work.

2. SAME—MAKING VESSEL SEAWORTHY—COST OF LINING FOR CARGO OF ASPHALT.

The owner is liable for the cost of lining a vessel and of removing the same, where, owing to her construction, it was necessary to render her seaworthy for the carriage of a cargo of asphalt, which was in contemplation when the charter was made.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, § 158.]

In Admiralty. Suit by charterer against owner for damages.

Wheeler, Cortis & Haight, for libelant.
Convers & Kirlin, for respondent.

ADAMS, District Judge. This action, in some of its aspects, is a sequel of the Dene Steam Shipping Company, Limited, the owner of the steamship Myrtledene, v. Tweedie Trading Company, 133 Fed. 589, where suit was brought to recover from the latter hire of the steamship amounting to $2,486.70. There was no dispute as to the amount of hire then due and the defense was grounded upon the al-

leged existence of certain offsets, amounting to $2,180.95, arising out of various expenses incurred by the charterer, the present libellant, in connection with the charter. The defense was sustained and the amount of the charterer's claim established by stipulation, leaving $320.76 due the libellant for which a decree was duly entered and subsequently appealed from by the libellant.

The present action was brought by the charterer to recover (1) the losses and expenses incurred by it in consequence of the condition of the vessel by reason of the failure of the respondent to use due diligence in prosecuting certain repairs, which were made necessary by delay in delivering the vessel under the charter of December 10, 1902, described in the former action. The claim for the cause just stated amounts to $3,500. Another claim (2) was the cost of lining the vessel so as to render her fit to carry a cargo of asphalt and the time lost in doing it, amounting to $566.87. Still another claim (3) was the cost of removing the lining and the time lost thereby, because the owner refused to accept re-delivery until the lining was removed, amounting to $189.20.

1. When the charter was made the vessel was on a passage from Hamburg to Fernandina. The charter provided:

"15. That if required by Charterers, time not to commence before Dec. 15th, 1902, and should Steamer not be ready for delivery on or before December 31st, 1902, Charterers or their agents to have the option of cancelling this charter such option to be declared Dec. 26 if steamer unable to sail from Fernandina by that date."

Prior to the departure of the vessel from Fernandina, finding that she would not be able to leave on time to fulfill the terms of the charter, the owner enquired of the charterer whether it proposed to employ the vessel or to cancel the charter. The reply was that it desired to use her and the option of cancelling was waived. While en route to New York to enter upon the charter, on the 4th of January, 1903, the vessel stranded on Long Island, through overrunning her distance in a fog, dead reckoning having been used by her navigators in the absence of observations. This was Sunday. With the assistance of a wrecking company's tugs, she was removed from the beach and proceeded to New York, which she reached Monday, the 5th. She showed no evidence of injury on the outside but on the inside all her floors were found to be knocked up. Being seriously damaged, it was necessary to repair her and written bids were obtained from several parties on specifications prepared by the surveyors who were employed on behalf of the owner and underwriter. Several such bids were received but none were accepted, and an oral bid made by the Morse Iron Works at the time of the opening of the written bids was accepted because it was lower in price and called for less time to do the work than the others. After the receipt of this bid, some changes were made, with the consent of Lloyds surveyor, in the manner of doing the work, which involved putting in extra intercostals for additional strengthening of the framing of the floors of the vessel. This, with other matters and the condition of the weather, which caused the men to work slowly, resulted in some delay, so that the steamer was not delivered in the 14 days provided for by the contract, but there were a number of ad-

ditional days required, making altogether 26 or 27. For the delay the underwriter of the owner, doubtless for its ultimate benefit, collected from the contractor about 9 days' demurrage at the rate of $100 per day. Every reasonable effort was made by the owner to get the work done quickly and the delay can not be said to have been caused through its fault.

The libellant complained of the delay that was taking place and asked for a delivery of the vessel at Norfolk instead of New York, as provided for in the charter. The owner being cabled to that effect by its New York agents agreed to such course and it was pursued. The arrangement did not amount to a composition of the difficulty between the parties and while not binding may, I think, be considered in determining the equities between them. Without regard to it, however, there does not appear to have been any obligation on the part of the owner to do otherwise than prosecute the repairs with reasonable diligence, which the testimony shows was done. The Morse Iron Works at the time was in good repute and in a fair condition to undertake the work and its assumption of the burden of completing it within 14 days, was something which the owner was entitled to rely upon in the conduct of its business. It does not affect the present question that the contractor was unable to perform its obligation with respect to time. The good faith of the owner clearly appears. The compensation exacted from the contractor was intended as indemnity for the loss of the vessel's time and can not be regarded as a fund which affects the controversy between the parties to this action. I conclude that there can be no recovery upon this claim.

2. The question is litigated as to who should pay for the expense of lining the ship to prepare her for the carriage of asphalt. It appears that the owner's representatives in New York received from the charterer the lumber required for such purpose and sent men aboard to do the work but the vessel sailed before much was accomplished and the remainder was done by the crew during the voyage. There was no agreement as to who should bear the expense. The master said he had no authority to assume it and the libellant's agent said that the question would have to be settled later.

As the preparations were required to render the vessel seaworthy to carry this cargo, because of her permanent battens, it seems that she should bear the outlay. Ordinarily, no doubt, as the testimony shows, the charterer is required to furnish what may be rendered necessary in the way of fittings by reason of the character of the cargo, such as grain, for example, but where the ship, owing to her construction, requires something to be done to put her in the condition presented by ordinary seaworthy vessels for lawful cargo then the burden is justly upon her. A cargo of asphalt was lawful and it was known that this ship would in all probability be employed to carry one from Trinidad. The permanent battens were a detriment to the carriage of this material and it was apparently the ship's duty to prepare herself for it. The matter was considered generally in the former case (133 Fed. 592) and I find nothing in the additional testimony taken here to change my conclusion with reference to the present charter, dated March 31, 1903. It was therein provided:

"Whereas the owners have presented notice to the Charterers that owing to steamer not having proceeded to South America on previous charter, they hold them liable for damages, now in consideration of the execution of this charter on the part of the charterers the owners agree to waive said claim and they also for said consideration agree that they allow the carriage of Asphalt on previous charter and on this charter (the charterers of course contending that they had this right anyway) and the owners agree to waive their claim for damages incurred by the steamer in fitting up for Asphalt & in repairing damage done to the steamer and for any loss of time incurred by the steamer in repairing said damage."

It seems clear that this expense should be borne by the owner.

3. The remaining claim is the expense of removing the lining. As the owner insisted upon this being done before it would accept a re-delivery of the vessel at the expiration of the charter party, the charterer was forced to incur the expense of taking it out, for account of whom it might concern. If the conclusion that it was necessarily put in to render the vessel seaworthy is correct, the removal was evidently the owner's duty if he would not accept the vessel in the condition she was in at the time of re-delivery. Therefore, I must conclude that the work was done for the owner's account and the charterer is entitled to reimbursement of its expenses.

There will be a decree dismissing the libel as to the first claim and providing for a recovery in the last two, which seem to be reasonably well established by the testimony, but if the respondent desires further proof or to contest the amounts, a referee will be had.