HARLOFF et al. v. BARBER & CO.

(District Court, S. D. New York. January 7, 1907.)

1. SHIPPING—CHARTERED VESSEL—LIABILITY FOR COST OF STOWAGE.

A single central line of shifting boards in the holds of a vessel, properly strengthened, held, on the evidence, sufficient for the safe stowage of a cargo of flint boulders for a transatlantic voyage, and the extra expense and delay occasioned by the master's refusal to so load as required by the charterer, and his demand for the construction of wing shifting boards and bagging of cargo, held chargeable to the owners.

2. SAME—FITTINGS FOR STOWAGE.

A chartered vessel required by the charter to be seaworthy is required to be so with respect to the stowage of cargo as well as in hull and equip-

ment, and, in the absence of special contract, to be supplied with proper fittings for the stowage of any lawful cargo.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, §§ 156, 158, 162.]

In Admiralty. Suit for charter hire.

Wheeler, Cortis & Haight, for libellants.

Butler, Notman & Mynderse, for respondent.

ADAMS, District Judge. This action was brought by Albert Harloff and Alrick Rodsetti, managing owners of the steamship Tyr, against the corporation of Barber & Company to recover a balance of hire claimed to be due for said steamer under a charter dated the 24th of January, 1905. The amount unpaid is alleged to be $3034.20 from which credits are allowed to the extent of $1366.17, leaving a balance of $1668.03, the amount sued for. The controversy arises from a difficulty which occurred between the parties concerning the stowage of a cargo of flint boulders, gathered on the seashore, to be transported from Dieppe, France, to Philadelphia. The defense may be conveniently stated in the words of a part of the answer, as follows:

"Fifth. Further answering the libel herein, the respondent alleges that it was provided, among other things, in the charter party above mentioned, that said steamer should be on her delivery to charterers:

'Ready to receive cargo, and tight and staunch, strong and in every way fitted for the service * * * and to be so maintained during the continuation of this charter party; to be employed in carrying lawful merchandise * * * between safe port or ports in * . * * United States of America * * * and or, Europe * * * as the charterers or their agents shall direct.'

That after the arrival of the Tyr at Boston, England, her master was directed by charterers agents to proceed with said steamer to Dieppe, France, a safe port in Europe, there to receive a cargo of about 2800 tons of flint boulders, a lawful cargo, and to take as much bunker coal in addition as the capacity of said steamer. permitted, and to proceed with said cargo to Philadelphia, a safe-port in the United States.

Respondent further alleges that said steamer arrived at Dieppe, France, about 5 P. M., Tuesday, 28 March 1905, where said cargo of flint boulders was in readiness for loading.

Sixth. Respondent further alleges upon information and belief that the customary method for the loading or stowage of such flint boulders, for transatlantic. carriage, in steamers similar to the steamship Tyr, is in bulk.

Upon the arrival of the Tyr at Dieppe, the agent of respondent's correspondents informed the master of said steamer that the cargo of flint boulders was in readiness and would be loaded in bulk when the steamer could begin to receive cargo. Thereupon the master of the said steamer refused to accept said lawful cargo and to load the same in the usual and customary manner, as aforesaid, but demanded of said agent that the whole of said cargo should be bagged or put in barrels or casks by the charterer, stating that otherwise he would not permit said cargo to be loaded on the Tyr.

Said .agent thereupon stated to said master that such a method of loading flint .boulders. was unheard of, unnecessary and not customary.; whereupon said master requested said agent to erect longitudinal shifting boards and cross-bulkheads in each hold, dividing said compartments into 'trunks' from top to bottom and further demanded that a portion of said cargo should be bagged. Said agents refused these demands but offered without prejudice. to supply the master with a reasonable quantity of deals or boards, if the master desired them, to supplement steamer's shifting boards, but said offer was refused and said master refused to receive said cargo in the usual and customary

manner. Said agent then requested said master to permit the loading of cargo in bulk up to the tunnel in the holds in order to avoid delay and since this quantity of cargo could be loaded up to the tunnel before any shifting boards would be required, but said master refused, whereupon said agent on said 28th day of March, 1905 notified said master, orally, that said steamer was on owners time and that hire would cease until the master consented to receive the cargo, and permit it to be stowed, in the usual and customary manner. Said oral notice was confirmed in writing by said agent on Wednesday 29 March 1905.

Seventh. Respondent further alleges, upon information and belief, that on 29 March 1905, upon the request of said master, respondent's agent at Dieppe called a board of survey, to report in respect of the method of stowing said cargo. Said board of survey met on Thursday, 30 March and recommended that a single fore and aft shifting board partition, strengthened by stanchions, in each hold would suffice to secure the cargo and that no further measures were necessary.

Respondent's agent then offered, without prejudice, to cause boards to be placed in accordance with the recommendations of this survey, reserving for future determination the question of whether owners or charterers should defray the expenses.

The master, however, refused to load in accordance with the recommendations of this first survey demanding four tiers of bagged boulders and additional cross bulkheads, and himself called upon the Norwegian consul at Havre to appoint surveyors.

This second survey, held on the afternoon of Saturday 1 April, recommended on Monday, 3 April, the erection of shifting board partitions similar to the first survey, and, in addition, two tiers of bagged boulders on top of the cargo. On Saturday 1 April, prior to the meeting of the board of second survey, the respondent alleges upon information and belief that the master had received instructions from his owners to proceed with the loading and to protest afterwards.

On Monday 3 April 1905 the master gave permission to charterers agent to commence loading and, in addition to the partitions recommended by the first board of survey, requested charterers agent to erect further partitions and to furnish him with about 3000 sacks, all of which was done under protest by charterers, and on the understanding that the same was without prejudice as to whether the expense incurred should be for owners or charterers account. The loading of cargo begun on Monday 3 April, and was completed about 10:30 P. M., Sunday 9 April. On Saturday 8 April a third board of survey, deputed by the Tribunal of Commerce at Dieppe, at the request of the master of the Tyr, surveyed the steamer and the stowage of her cargo, approved the partitions recommended by the first board of survey and declared in their report that the stowing of two tiers of boulders in bags on top of the bulk cargo was useless. Against the report of the said third board of survey the master of the Tyr again protested.

The steamer sailed from Dieppe about noon on Monday 10 April 1905 and in due course arrived at Philadelphia.

Eighth. For a further defence, and as a counterclaim or set-off to the claim of the libellants herein, respondent alleges, on information and belief, that had the master of the Tyr on 28 March 1905, permitted the loading of said cargo in accordance with the usage and custom of the trade, using such shifting boards as were on the steamer and accepting the offer of respondent's agent to provide a reasonable quantity of deals or boards to arrange shifting board partitions, in substantial accord with the subsequent recommendations of the first board of survey, said steamer could, and with reasonable dispatch should, have been loaded and ready for sea by noon on Saturday 1 April 1905, but that by reason of the wrongful, unreasonable and improper refusal of the master of said steamer to load in accordance with the custom of the trade, and the offer of the aforesaid agent, said steamer was improperly and wrongfully detained and delayed from noon on Saturday 1 April until noon on Monday 10 April, on account of which respondent alleges that it is entitled to deduct from the charter-hire of said steamer an amount propor-

tionate to the monthly charter-hire thereof and that the same, allowing 2½% deduction thereof for commission, amounts to the sum of £181-3-3 Sterling.

Respondent further alleges that the aforesaid conduct of the master of the Tyr necessitated the sending of many cables between Liverpool, New York and Dieppe, the dispatch of a special agent of respondent's correspondents from Liverpool to Dieppe, the calling of surveys, cost of extra shifting boards, extra labour, 2868 sacks supplied to master and expenses of moving bunker coals improperly placed in No. 2 hold by master causing further additional expenditures amounting to £162-4-8, whereof a detailed schedule is hereto annexed marked A and made a part of this answer, making a total of £343-7-11 or, at $4.85-¾ to the pound sterling, $1668.03, in which amount respondent alleges the owners of the said steamer are indebted to it and which respondent seeks to set-off against the amount of charter-hire herein claimed."

These boulder flints are a commercial article which are pulverized and used to make clay and china.

The testimony shows that the controversy arose when the charterer sought to load the steamer at Dieppe with the said cargo of boulders, which are stones of varying size from the size of a pigeon's egg to that of half the size of a man's head. For the most part they were smooth, rounded and polished by the action of the waves rolling them on the sea-shore. The libellants contend that the charterer sought to load them in bulk without any precaution against movement in the vessel, while the respondent contends that the charterer offered to put up shifting boards if the master thought necessary, to be placed where he wished them and for that purpose to supply a reasonable quantity to erect necessary partitions. They could not, however, come to any agreement and a board of survey was appointed at the request of the master by the respondent's broker. This board was composed of three men often called upon to act as surveyors by the Tribunal of Commerce, a local court at Dieppe for settling commercial and shipping matters in dispute. The report by the surveyors was made as follows:

"We undersigned captains: Miniac, Guérin & Veyrat, have, according to the request of Mr. Gens, ship-broker at Dieppe, been, on the 30th of March 1905, on board of the Norwegian steamer Tyr of Bergen, lying in the harbour of Dieppe, to load a cargo of boulders, to examine how to place the shifting boards to prevent the boulders shifting from one side to the other.

The undersigned are all of opinion that a single shifting bulkhead in the middle of every hold is sufficient, provided said bulkhead extends to four feet above the top of the cargo.

Further, said bulkhead shall be strengthend, at intervals, on each side, by stanchions fixed with wedges on both sides.

However, in the hold No. 2, two smaller bulkheads shall be fitted on the stanchions which support the hatchway and this in order to diminish the strain which would have to be borne solely by the central shifting boards under the hatchway, on account of the distance existing between the stanchions under the coamings fore and aft of said hatch.

The boulders in bags shall be stowed in the tween deck.

We do not see that any further measures are necessary.

Signed in Dieppe on the 30th of March 1905.

[Signed]                               Miniac. Guérin. Veyrat."

This report was enclosed to the master by the broker in a letter as follows:

"Dieppe, 30th March 1905.

Captain Michelson S/S 'Tyr' Dieppe—Dear Sir:

Enclosed I beg to hand you copy and translation of the Surveyors' report and I have just advised Messrs. J. Barnett & Co. that you refuse to accept

the same, unless besides: 1st that the whole cargo be fastened with four tiers of boulders in bags on top and 2d a cross bulkhead be built to separate the coals and steady cargo in No. 2 hold.

As already written, Time-charterers repeat that your steamer's hire ceases from yesterday morning until their orders to load the cargo are carried out.

Yours truly, D. Gens."

The master replied as follows:

"Dieppe 29th March 1905.

D. Gens, Esq., Agent for Timecharterers of S/S Tyr—Dear Sir:

In reply to your favor of today just received, I beg to inform you that I am not refusing to load the boulders but that I demand the cargo loaded and secured in an efficient and proper way, so that the ship on account of the cargo can be in a seaworthy condition for an transatlantic voyage.

I further beg to notify you that the steamer is lying for account of Time charterers, and they will have to stand all risk and loss of time, as they have to perform the loading, and taking all necessary steps for securing the cargo in a good and efficient way, of which I have had no reasonable proposes up to time.

No doubt it can bee done but the expense will bee for there account, and should no doubt come up in a good sum of money, before an independent trustworthy person whit proper experience on this matters will declare the cargo so well secured that no property or human life are put into unreasonable risk on account ship having an very dangerous cargo.

As there are no custom established for bulk cargo of boulders in transatlantic trade, you will have to take necessary steps for loading in an proper and safe way, to which, I shal not object, and propose you to appoint experienced independent men to give their oppinion on the matters.

Yours truly, M. Michelsen, Master."

The master refused to act upon the report and demanded further steps for security as shown by his letter last quoted. His testimony upon this point was:

"Q. Didn't you still decline to allow the loading to proceed under such an offer? A. I declined to load in the customary manner.

\* \* \* \* \* \* \* \* \* \*

Q. Didn't you refuse to allow the loading to proceed according to the recommendations of that first report? A. Yes, I did.

\* \* \* \* \* \* \* \* \* \*

Q. In addition to the recommendations in that first report of the survey called by Mr. Gens, did you demand that a cross bulkhead be put in the No. 2 hold, and that the whole cargo in each hold be fastened on top, with four tiers of boulders in bags? A. Yes, I did.

\* \* \* \* \* \* \* \* \* \*

Q. As I understand you refused to load according to the survey report of the survey called by Mr. Gens, did you not? A. Yes."

He called upon the Norwegian Counsel General at Havre for the appointment of a second board of survey. The Consul General appointed two men, one a civil engineer and the other a master mariner engaged in the ship chandlery business, both of Havre. They made a report as follows:

"Rapport.

We undersigned duly appointed by the Norwegian & Swedish General Consul at Havre, arrived here from Havre today at abt. 1.30 p. m. to inspect and report on the loading of the cargo in the S/S 'Tyr' of Bergen, (Norway).

After having examined the ship and the nature of the cargo, we have come to the following result:

The cargo intended to be shipped in said ship consists of Bowlders (Silex in French) which is to be delivered in bulk.

We find however, that if this cargo be shipped in bulk without necessary precautions, the vessel will not be in a seaworthy condition.

To make the vessel seaworthy with this cargo, we recommend that bulkheads of 3" planks must be put up amidships in each hold from fore to aft to the height of abt. 4 feet (engl) above the level of the cargo. These bulkheads to be properly secured by stanchions of 6" x 6" from amidships to the wings, nailed down tight by spikes, and secured at each end by wooden chocks to prevent them from getting out of their position from the strain and weight of the cargo.

In the No. 2 and No. 3 hold, we further recommend, that two bulkheads in each hold be put up amidships on each side of the hatchways to the same height as the others and fastened to the iron stanchions in the edge of the hatchways.

To keep the cargo as much as possible in its level condition, we further recommend, that two tiers in height of bags filled with same cargo, be placed on top of the bulk cargo in all four holds to prevent same from making further heavy strain on the bulkheads.

It is our candid opinion that the precautions we have recommended are necessary for making the ship in a seaworthy state, having taken into consideration, that the whole cargo will be placed below the ship's waterline and thus cause heavy rolling and working of the vessel, especially in rough weather and seas in the North Atlantic, where this vessel is bound.

Dieppe the 1st of April 1905.

Ferd Pande,                                            L. Dero,
    Master Mariner.              ,              Ingenieur Civil."

Later another survey was held and report made as follows:

"Dieppe 8th of April 1905.

We, undersigned, captains surveyors, went on board of S/S Tyr of Bergen, Capt. Michelsen, in order to ascertain that our instructions had been duly carried out, in accordance with our report signed on the 30th of March 1905.

We found that the shifting bulkheads had been erected and strengthened, giving every guarantee against the rolling of the cargo.

That, in No. 2 and 3 holds, two lateral shifting bulkheads had been fitted on each side of the hatches, thus dividing the middle of the holds in two compartments.

That, these bulkheads enable the vessel to proceed on her voyage with perfect safety and that it was useless to put two tiers of bags on top of the cargo, as the captain had required, contrarily to what is customary to do with cargoes of flint stones in bulk.

Signed at Dieppe on the 8th of April.

    [Signed]                              L. Veyrat.  Guérin.  L. Miniac."

Another survey was held and report made as follows:

"8th of April 1905.

We, undersigned, appointed by Tribunal of Commerce of Dieppe, at the request of Captain Michelsen, master of the Norwegian steamer Tyr, of Bergen, to ascertain whether said steamer loaded with boulders in bulk for Philadelphia, can safely proceed on her voyage in her present state.

Having accepted this mission & after having given oath before the President of the Tribunal, we went on board of the steamer, where we found the captain.

We found that in No. 1 and No. 4 holds a bulkhead had been fitted in the middle, and strongly secured by stanchions, chocked in the wings, and that in No. 2 and 3 holds, two side bulkheads had been put besides the central ones, and that same had been strongly secured on the wings and on the central bulkhead.

We, therefore declare that all the necessary precautions have been taken for the safety of the steamer, which could proceed in its present state.

We, besides noticed that in No. 1, 2 and 3 holds, bags have been filled with boulders and placed on top of the cargo, but we consider this useless.

[Signed]       Savary, harbour master.
Thurel, pilot master.
Godard, captain."

The principal question in the case is whether the precautions called for by the first report were sufficient, or whether those recommended in the second report was necessary.

A great deal of testimony has been taken at Dieppe and here in support of the respective contentions. That at Dieppe consisted of D. Gens, the ship-broker before mentioned; Paul Runlard, a flint merchant in Dieppe; Robert Delarelle, the same; S. Holl, the same; L. Miniac, Captain in the Dieppe-Newhaven Line of steamers; Captain Guérin, the same; Captain Veyrat, consignee of fishing boats at Dieppe, and Joseph Barnett, ship-broker in Liverpool, England:

The testimony taken by the respondent at Dieppe is to the general effect that the cargo was prepared for the Tyr before her arrival and was then lying on the wharf, or in its vicinity, in readiness for loading. The master, however, instead of taking it on board immediately condemned it as unsafe unless great precautions should be taken. It is shown that the methods proposed by the first survey were in conformity with ordinary Dieppe practice, which is practically the only port for the shipment of these stones across the Atlantic. Mr. Gens who had had considerable experience, so testified as did the other witnesses mentioned and they all agreed that the precautions called for by the second survey, and not provided for by the first survey, were a useless expense, and entirely unusual.

The surveyors Dero and Pande, of the second survey, were examined abroad as witnesses for the libellants and they support the recommendations of their report. They had not, however, had any experience with boulder flint cargoes and their competency to testify as experts in the stowage thereof is open to very grave doubt.

Numerous other witnesses have been examined, viz.: The master of the Tyr, Michelsen; the chief officer of the same, Boe; the chief engineer of the same, Bruland; James P. Kimmey, master mariner and agent in Philadelphia of the Board of Underwriters of New York, and Peter R. Frodstat, master mariner on behalf of the libellants.

In addition to the foregoing witnesses whose testimony was taken by depositions, numerous witnesses were examined here in court, viz.: Valdimar Lassen, superintendent of the Scandinavian American Line; Thomas W. Nichols, surveyor for the New York Board of Marine Underwriters; John W. Cann, surveyor for the National Board of Marine Underwriters; Mark Kirby, master mariner; Ralph J. M. Bullowa, one of libellants' counsel; George D. Woolley, manager of steamship companies in New York, on behalf of the libellants. Francis H. Pollexfen, ship owner, broker and coal shipper; John D. McGlincey, importer of chalk, china, clay, pebble and boulder flints; William S. Samuels, marine surveyor, etc.; Sylvester S. Dunning, surveyor for the New York Board of Marine Underwriters, and Thomas J. Grace, stevedore in Philadelphia for the flint ships arriving there, on behalf of D. McGlincey.

All the testimony has been duly considered. It has taken a wide range and there appears to be a very prevalent impression among shipping people who have had no experience with this kind of cargo, that it is an extremely dangerous one to transport. It does not seem necessary to discuss such testimony in detail as it is apparent that it is based upon a misconception of the facts. All of the numerous witnesses who have had experience with boulder flint cargoes agree in stating that it can be carried safely without extraordinary precautions and that a single line of shifting boards in the centre of the hold would have sufficed here. The testimony satisfies me that such shifting boards, secured and supplemented as provided for in the first survey, would have answered the purpose of properly protecting this cargo from movement and that the precautions insisted upon by the master in excess of the requirements mentioned were entirely unnecessary. The stowage of the cargo was within the master's reasonable discretion but he had had no previous experience with such a cargo and was not justified in calling upon the charterers, in order to satisfy his ignorant ideas, to go to the expense for the stowage far in excess of proper requirements.

It seems that by the stowage of some of the cargo, from 120 to 150 tons, upon the awning or between deck the vessel was relieved from the effect of stiffness which would have resulted from having all of the cargo in the holds. It is not at all clear that stowage between decks was known to the members of the second board of survey and therefore when they made their recommendations, it is doubtful if they were fully aware of the vessel's condition.

This cargo settled about a foot on the voyage so that it was evident there was very little danger of its being disturbed by the ordinary contingencies of the passage, though it was not tommed down. The centre line of shifting boards was apparently sufficient to prevent any deleterious movement. It is urged that notwithstanding all the precautions taken, the cargo did shift on the way over. The master so testified but said that it was very slight, about 3 degrees, and of no importance and such shifting as there was may be disregarded.

The contract for the hiring of the ship required her to be in all respects seaworthy for the voyage she was about to undertake, which included not only seaworthiness in hull and equipment but also with respect to the stowage of the cargo. Corsar v. J. D. Spreckels & Bros. Co., 141 Fed. 260, 264, 72 C. C. A. 378. She was therefore required to be provided with sufficient shifting boards to properly stow the cargo. The duty is upon the owner of a ship to render her fit in design, structure, condition and equipment to encounter the ordinary perils of the voyage and to be fit for the receipt and carriage of a special cargo. Carver on Carriage by Sea, §§ 18, 19a, 20. It is also said by the same author (section 273):

"The duty of stowing the cargo in the ship lies on the owner, and on the master as his representative, unless there is an agreement to the contrary. The master ought to be a competent stevedore, and he must see that the stowage is done with skill and care. * * * Moreover, the ship must provide whatever dunnage may be required * * * such as mats, battens, loose wood, etc. These are needful to keep the goods in their places. * * *"

A chartered vessel in the absence of a special agreement, is required to supply herself with proper fittings for the carriage of lawful cargo. Dene Steam Shipping Co., Ltd., v. Tweedie Trading Co. (D. C.) 133 Fed. 589; Id. (C. C. A.) 143 Fed. 854.

There will be a reference to a commissioner to ascertain and report upon the respondent's unnecessary expenditures hereunder and if it appears that they equal or exceed the balance of hire the libel will be dismissed.