## HILDEBRAND v. GENEVA MILL CO.

District Court, M. D. Alabama, S. D., at Dothan. April 18, 1929.

No. 106.

Smiths, Young & Johnston, of Mobile, Ala., and Farmer, Merrill & Farmer, of Dothan, Ala., for libelant.

W. O. Mulkey, of Geneva, Ala., for respondent.

CLAYTON, District Judge. On December 2, 1925, the libelant and owner of the schooner Edward R. Smith entered into a charter party agreement in the name of A. L. McLean, the master of the vessel, through Emory Sexton & Co., agents and ship brokers of libelant, with the Geneva Mill Company, through Fillette-Green & Co., agents and ship brokers of respondent, for the transportation of a cargo of lumber from Pensacola, Fla., to Miami, Fla., for the sum of $5,000.

Among other things, the charter party provided that:

"It is understood that vessel is at Norfolk, Va. ready to proceed to Miami, Fla. with cargo of lumber and after delivering that cargo will proceed to Pensacola, Fla., to load under charter party dated November 30th, 1925 and after completing that voyage will proceed immediately from Miami to Pensacola to load under this charter."

Under the terms of this charter, a full cargo, under and on deck, of dressed lumber was to be transported.

On November 30, 1925, previous to the execution of this charter party, the libelant and respondent had executed another or a first charter party agreement for a cargo of lumber from Pensacola to Miami. At the request of the respondents, on January 9, 1926, the voyage was changed from Pensacola, to Tampa, Fla., instead of to Miami, at a reduced freight charge of $4,500 instead of $5,000.

At the time the contracts were executed, the Edward R. Smith was at Norfolk, Va., with a cargo of lumber to be carried to Mi-

ami, Fla., and there discharged, and, as set out in the foregoing quotation from the charter party agreement, was to proceed from Miami after discharging its cargo there, to Pensacola to enter upon the two contracts here under consideration. It is without dispute that the two charter agreements were entirely separate and executed at separate times. The first charter party was completed and the freight paid; and it is not, therefore, involved in this suit.

The Edward R. Smith proceeded with its cargo from Norfolk, Va., to Miami, Fla., reaching Miami about December 20, 1925, and completed discharging its cargo on January 13, 1926. On that day a vessel was capsized in the channel at Miami and blocked it, thereby preventing any other vessels passing through this channel out of the harbor. There was an old channel, known as the Cape Florida Channel, which had been abandoned for a long time. The captain of the schooner undertook to get his vessel out of the harbor through the abandoned channel. At first he was unable to get a tug to undertake to tow the vessel through. However, after tugs had carried two lighter vessels through the Cape Florida Channel (the abandoned channel), the Edward R. Smith was towed through this channel on January 21, 1926. She then proceeded to Pensacola, arriving there February 1, 1926, notified the respondent of her arrival, and, as provided by the charter party agreements, respondent commenced to load the vessel with pine lumber for the first voyage.

It is observed that the charter party provided that:

"The act of God * * * and all and every other dangers and accidents of the seas, rivers and navigation of what nature and kind soever during the said voyage, * * * or any extraordinary occurrence beyond the control of either party, always mutually excepted."

As provided by the terms of the charter party, the vessel did proceed from Norfolk, to Miami, and from Miami to Pensacola, and commenced taking on a cargo under the first charter party. There was no delay within the terms of the agreement of the parties in commencing the first voyage. As soon as the ship was loaded at Pensacola by the respondent, she proceeded to Tampa, Fla., and there discharged the cargo, completing the same on March 6, 1926.

Shortly after the cargo had been discharged, and on the same day, one Hubert Ansley, the authorized agent of the Geneva Mill Company, verbally notified Capt. Mc-

Lean, the master of the schooner, that the respondent canceled the second charter party, which is the one involved here. At the time that this agent of the respondent undertook to cancel the charter party, he stated in the presence of Capt. McLean that the respondent was "not in a position to load." And in answer to a question by Mr. Freeman, he said, "It would be suicide for the Geneva Mill Company to try to load." Capt. McLean refused to take verbal notice of the attempted cancellation, and then undertook to get in touch with the Geneva Mill Company, respondent, by telephone and telegraph, but without success. The libelant, through his ship brokers, Emory Sexton & Co., undertook by a Captain Barnes to get a written refusal or cancellation, or to adjust the matter. Barnes likewise telephoned and telegraphed respondent but received no reply, and on March 17 went in person to Geneva, Ala. Barnes did not get any information from Mr. Morris, the president of respondent company. Morris said nothing to him except, in substance, that he was not handling the matter, and that he (Barnes) would have to see Hart, another officer of the company, who was then in Birmingham. Hart returned to Geneva in the afternoon, and Morris made an appointment with him for Barnes at the office of respondent, but Hart did not meet the appointment. About 7 o'clock that night Barnes went to Hart's residence where Hart was sick in bed. Barnes offered the vessel, and Hart refused to make any statement or further cancellation, and refused to answer any further telegrams or to give any further notice. The one thing that Hart did was to say, in substance, that the Geneva Mill Company had lost enough on the misrepresentation as to the vessel's position.

The two charter parties of the schooner with respondent were identical in every respect as to terms, one dated November 30, 1925, and the other dated December 2, 1925. The first was performed. Under it the vessel was required to go from Miami to Pensacola, and thence with cargo to Tampa. The profits made on that voyage were $3,804.34. To have performed the second charter party, the vessel would only have had to sail from Tampa to Pensacola and thence back to Tampa. The difference between the distance to be sailed would have added $500 to the profits. This would have made the profits of the second voyage $4,304.34.

The vessel was ready to proceed from Tampa to Pensacola under the charter party of December 2, 1925, but the charter party was breached, canceled, by respondent. The

vessel then lay idle at Tampa, seeking to get other employment, until March 26, 1926, when she made a charter party with the Turner Lumber Company to make a voyage with a cargo of lumber from Palatka or Jacksonville, Fla., to Irvington, N. Y. Under this new charter party she earned $2,118.92 in 58 days, or $36.54 a day. The first 24 days of this voyage covered the last 24 days that she would have been engaged in performing the charter party of December 2, 1925, had it not been canceled, and during this time she earned at the rate of $36.54 a day—$876.96. Deducting this from $4,304.34, the amount she would have earned had her charter party not been breached by respondent, gives her a net loss on account of such breach or cancellation amounting to $3,427.38. The respondent admits in its answer the execution of both charter parties and the cancellation or refusal to permit the vessel to load and transport the lumber under the charter party here involved.

Respondent undertakes to set up in defense, and in seeking affirmative relief by way of set-off, damages, first for delay in the performance of the first charter party, and, second, damages by reason of the capacity of the schooner having been misrepresented. Respondent contends that it would have taken so many days for the vessel to have proceeded from Norfolk to Miami and discharged its cargo there, and proceeded from Miami to Pensacola, and further insists that the time which should have been consumed in reaching Pensacola would have put the vessel at Pensacola between December 20 and 30, 1925. It is further urged that the schooner was represented to have a capacity of 500,000 feet of dry rough cypress, and having that capacity of dry rough cypress, it should have carried 660,000 feet of dry dressed pine, which, as it is asserted, was the kind of lumber shipped by respondent on the first voyage.

It is without dispute that there existed in Florida in the fall of 1925 an unprecedented boom or wild speculation in real estate; and that all building materials including lumber reached very high prices; and that there were many anxious buyers at exorbitant prices. As a result of the boom condition, Miami being in the center of it, the harbor at Miami was congested to such an extent that vessels could unload and load only after long delay. It is further without controversy that this condition and congestion at the Miami port was well understood and known by the parties to the suit at the time of entering into the charter party agreements, and that therefore the parties contracted with reference to the time of performance as set out in these agreements, namely, that the ship was at Norfolk, Va., with a cargo and would go to Miami and discharge its cargo and then proceed to Pensacola on these charter party agreements, and the further provision making certain exceptions to accidents of the seas, rivers, and navigation.

The undisputed evidence is that this boom condition commenced to lessen in January and February, 1926, and that the "bubble bursted" and prices commenced sliding downward about the last of February or the first of March, at or about the time the respondent sought to cancel the contract now under consideration.

On January 9, 1926, Emory Sexton & Co., libelant's ship brokers, wrote Fillette-Green & Co., respondent's ship brokers at Pensacola, giving the charterers the privilege of discharging at Key West or Tampa on either or both of the charters, and making the freight rate $4,800 and $4,500, respectively. On January 13, 1926, the same day the vessel finished discharging its Norfolk cargo at Miami and was ready to proceed to Pensacola, Fillette-Green & Co. acknowledged receipt of this privilege or option to discharge at Tampa or Key West at the reduced rate, and thanked them for securing the authority. So that on January 13, 1926, the Geneva Mill Company treated the contracts as binding, thus waiving any former delay, if there was such delay.

On November 27, 1925, Fillette-Green & Co. wired Emory Sexton & Co. that:

"Can close immediately two or four vessels five hundred to one million feet capacity each dressed lumber Pensacola Miami," etc.

On November 28, Emory Sexton & Co. replied to Fillette-Green & Co., saying that:

"Schooner Edward R Smith five hundred thousand dry cypress capacity expected ready sail from Norfolk for Miami middle next week with lumber offers accept lump sum five thousand dollars cargo lumber Pensacola Miami freight prepaid and irrevocable," etc.

On the same date this telegram was confirmed by letter; and on November 30, Fillette-Green & Co. wired Emory Sexton & Co., accepting the schooner for the first charter party of that date. On December 1, Emory Sexton & Co. wrote Fillette-Green & Co., in reference to the Edward R. Smith, as follows:

"As we telegraphed you today, the owners are willing to charter second trip on the same conditions but they do not care to give

an option. This vessel's loaded draft with her last cargo of cypress was 15′ 3″. This is about her average draft. With coal she might go down to 16 feet. We presume the average run of cypress that we are getting is about the same as your pine lumber. If the vessel is not held up a long time in Miami on demurrage, we should expect that she might arrive at Pensacola for loading late this month. Somewhere after the 25th. We can tell better of course after she arrives at Miami."

And on December 2, Fillette-Green & Co. wired Emory Sexton & Co., confirming the second charter agreement. On December 7, Fillette-Green & Co. wrote Emory Sexton & Co., as follows:

"Shippers advise that they understand that dry cypress weighs about 3,000 pounds per thousand superficial feet, and are basing the arranging of their pine cargo according-ly. This refers to your recent letter stating that the vessel draws about 15′ 3″ with cy-press. If you have not already given us approximate estimated cargo capacity of dressed pine, please be kind enough to do so by return mail."

This letter was written after both charter party agreements had been made, and in re-ply thereto, on December 9, 1925, Emory Sexton & Co. wrote Fillette-Green & Co. that:

"Regarding the vessel's capacity. If the lumber your charterers are shipping is not heavier than cypress and they will stow it in as well, we see no reason why this vessel should not carry 500 M. feet. As you know, the amount of lumber a vessel carries de-pends largely on stowage and weight. They might be shipping lumber that could not be stowed closely."

The testimony of the master and of E. C. Schaefer, which is uncontradicted, shows that this schooner did in fact carry at least seven cargoes of dry cypress lumber previous to that time, and that these seven cargoes of dry cypress lumber ranged from 499,562 feet to 505,963 feet. It was only represented to have a capacity of 500,000 feet of dry cypress lumber. The testimony of Mr. Hart tends to show that he was in Miami, Fla., between Christmas and January 1st, and had a con-versation with Capt. McLean, the master of the vessel. He further testified Capt. Mc-Lean then told him that the vessel had car-ried 650,000 feet of dry dressed pine from Norfolk, Va., to Miami, and that he estimated it would carry that much dry dressed pine on the voyage now involved. While Mr. Milli-gan corroborates Mr. Hart to the extent of

his having a conversation with Capt. McLean, he fixes the time of such after the 26th day of December, possibly four days; but states that he did not hear the conversation itself. Mr. Hart further testified the vessel was un-loaded at that time. Capt. McLean's testi-mony was to the effect that the vessel was not unloaded until January 13, and this is corroborated by his telegrams to Emory Sex-ton & Co. from the 13th to the 21st, stating that his vessel had been unloaded on the 13th and that the harbor was blocked and he could not get out; and finally wiring on the 21st that he had gone through the Cape Florida Channel and was on his way to Pensacola. McLean testified that while he had a con-versation with Hart, he (McLean) stated in such conversation that the cargo from Nor-folk to Miami consisted of 660,000 feet, gross measure, of dry dressed pine, and that the previous cargoes of dry cypress amounted to 500,000 feet, but did not tell Hart what the vessel would carry from Pensacola because he did not know the heft of the lumber. At the time of this conversation both the charter party agreements had been executed, and, of course, they could not be induced by any con-versation of Capt. McLean at that time. The bill of lading from Norfolk to Miami is in evidence, showing that there were 660,019 feet on and under deck in that cargo.

There is testimony of the respondents to the effect that if the vessel would carry 500,-000 feet of dry cypress, it would carry from 600,000 to 650,000 feet of dry dressed pine lumber; that dressed pine lumber is smaller in bulk than dry rough cypress lumber or pine in the rough, and when dry is lighter than cypress lumber. There is also expert testimony showing the relative weights of pine and cypress lumber, dressed and in the rough. Exhibit 14 to respondent's testimony shows that 47,499 pieces, making 595,844 superficial feet of lumber, were shipped to Pensacola to be loaded on this vessel, and the bill of lading shows that 47,003—all except about 500 pieces of the lumber—were loaded on the vessel, and that the vessel's cargo consisted of 457,819 superficial feet, net meas-ure, as calculated by the shippers.

Now as to the findings upon the testi-mony: It is clear that there were two charter party agreements, one of November 30, 1925, and the other of December 2, 1925. The first charter party agreement has been fully per-formed, the freight paid, and the cargo trans-ported. All of the alleged set-off or recoup-ment attempted to be set up by the respond-ent grows out of the agreement of November 30, 1925; and that is that the respondent

had left over about 150,000 feet of lumber that was not transported on the cargo under charter party of November 30, and that a depreciation in price followed the delay, and therefore that the lumber transported was of less market value. This contention springs out of the charter party agreement of November 30, which is entirely a different contract from the one here sought to be enforced, namely, the charter party agreement of December 2, 1925.

In the oral argument and brief the respondent claims: (1) That there was great delay in completing the voyage that was pending when these charter agreements were made, and that this delay postponed the time of performing both charter parties with respondent, and justified the charterer in declining to load under the second charter party; (2) that prior to the making of the first charter party, there was a misrepresentation of the capacity of the vessel, and that this justified the cancellation of the charter party dated December 2, 1925, and also a recovery of damages for the loss under the first charter party; and (3) that it was necessary for the vessel to proceed to Pensacola and give notice of readiness for cargo before claiming a breach by the charterer. These matters are set up in the answer as follows:

"This respondent avers that its agents were inexperienced in matters of maritime contracts or charter parties, and that when the first of these charter parties with libelant was entered into, it was agreed and understood and an assurance given by the agent representing libelant that said schooner or vessel would be at Pensacola, Florida, from the 20th to the 30th of December, for the purpose of receiving its cargo, and that the said schooner had a capacity, in lumber of six hundred thousand feet. Respondent avers that said schooner did not reach Pensacola under the said charter party originally entered into until on or about the 1st of February, and that as result thereof, this respondent incurred damage.

"At that time the respondent could not make the delivery within the time the contract was made with the various persons, corporations, who had purchased its lumber, and that because of that, these purchasers would not receive the lumber at the agreed price, but at a greatly reduced price.

■ The answer further sets up the amount of the loss under this special contract, and seeks to offset the same against the damage claimed under the libel and to re-

cover the excess. This contention is not sound, for the estimates as to the time of the arrival were made during the negotiations of the contract and before it was reduced to writing, and the contract, when reduced to writing, of course superseded these alleged verbal stipulations. Bijur Motor Lighting Co. v. Eclipse Mach. Co. (C. C. A.) 243 F. 600, 604; Seitz v. Brewers' Refrigerating Machine Co., 141 U. S. 510, 12 S. Ct. 46, 35 L. Ed. 837.

■ Respondent's contention is ineffectual, because damages arising out of a special contract cannot be recovered unless the party against whom the damages are sought had notice of the existence of such special contract and of its terms before or at the time when the contract was finally entered into. Kelly v. Fahrney (C. C. A.) 97 F. 176; Globe Refining Co. v. Landa Cotton Oil Co., 190 U. S. 540, 23 S. Ct. 754, 47 L. Ed. 1171. See other cases cited in 6 Fed. Dig. (1–300 F.) title "Damages," ☞23, p. 6351.

■ There is no such thing known to admiralty as a set-off as in common-law actions. It is true a respondent in admiralty may in his answer recoup damages arising out of the same transaction as that sued on, but cannot recover for any excess nor recover for damages arising out of any other transaction. American Steel Barge Co. v. Chesapeake & Ohio Coal Agency Co. (C. C. A.) 116 F. 857; Anderson v. Pacific Coast Co. (D. C.) 99 F. 109; United Transp. & Lighterage Co. v. New York & Baltimore Transp. Line (D. C.) 180 F. 902; Id. (C. C. A.) 185 F. 386; Monongahela & Ohio Dredging Co. v. Rodgers Sand Co. (D. C.) 296 F. 916; Anderson & Co. Inc., v. Susquehanna S. S. Co. (D. C.) 275 F. 989 (C. C. A.) 6 F.(2d) 858; Howard v. 9889 Bags of Malt (D. C.) 255 F. 917; 1 Fed. Dig. (1–300 F.) ☞35, pages 158–161.

■ Manifestly, as these damages are alleged to have arisen out of the transaction covered by the first charter party, they cannot be set off in this suit. Furthermore, if the damages had been recoverable, such recovery cannot be had except by an original libel in the nature of a cross-libel, upon which process must have been issued and served just as upon an original libel. Ex parte Indiana Transportation Co., 244 U. S. 456, 37 S. Ct. 717, 61 L. Ed. 1253; Mayer & Lage, Inc., v. Prince Line, Ltd. (D. C.) 264 F. 854.

The original charter party dated November 30, 1925, provided that:

"It is understood vessel is now at Norfolk,

Va., and expected to be ready to said for Miami about December 2nd, 1925 with cargo of lumber and will proceed light from there to Pensacola to load under this charter."

And the second charter party, dated December 2, 1925, provided that:

"It is understood that vessel is at Norfolk, Va., ready to proceed to Miami, Fla., with cargo of lumber and after delivering that cargo will proceed to Pensacola, Fla. to load under charter party dated November 30th, 1925 and after completing that voyage will proceed immediately from Miami to Pensacola to load under this charter."

■■ Under these provisions, the only duty resting upon the vessel was to proceed upon the voyage with reasonable dispatch, and the burden was upon the charterer to show the vessel's failure to perform its duty in this respect. Thebideau v. Cairns (D. C.) 171 F. 233; Tweedie Trading Co. v. Dene Steam Shipping Co. (D. C.) 140 F. 779.

It is not shown when the vessel sailed from Norfolk, but evidently it was about December 2. It arrived at Miami under the charter party that preceded those with the respondent on December 20. So the vessel consumed about 18 days in making this voyage. She proceeded from Miami on January 21, and arrived at Pensacola on February 1—10 days. There is no complaint of delay in the voyage from Miami to Pensacola. The court is of opinion that if the voyage in 10 days from Miami to Pensacola was reasonable, then, also, was the voyage from Norfolk to Miami, a greater distance, in 18 days reasonable.

The real delay arose from the circumstances shown by Capt. McLean, that is, when the vessel arrived at Miami, her berth was occupied, and there was already in port a vessel entitled to the next turn, so the Edward R. Smith was only entitled to berth thereafter.

■ It is the duty of the charterer, in the absence of some specific stipulation to the contrary, to furnish a berth for his vessel, and delay on account of the congested condition of the port of discharge is chargeable to the charterer and not to the vessel. P. Dougherty Co. v. 2471 Tons of Coal ex Barge Annapolis (D. C.) 278 F. 799, 803. So that whatever the delay was arising out of the congestion of the port, it was not chargeable to the vessel.

When the vessel obtained a berth, it discharged the cargo with dispatch, finishing the discharge on the 13th day of January, 1926. And it is not shown that the time consumed at Miami was unreasonable.

Upon the question of capacity of the vessel, there is little conflict. The testimony of a competent witness shows that he was familiar with a number of charters of the schooner Edward R. Smith just preceding these in controversy, and with the cargoes carried under such charters, and that the vessel averaged more than 500,000 feet of dry cypress to the cargo. His oral testimony was supported by charter parties and bills of lading showing such facts.

The greater weight of the testimony shows that a vessel will carry more feet of dry dressed pine than of rough dry cypress if they are of the same weight, and that pine is as heavy or heavier than dry cypress. Wet cypress, of course, is much heavier than pine, and the weight of lumber depends to a large extent on how dry it is; so that without a strict comparison between two lots of lumber, it is impossible to say what their real weights are or how they will affect the capacity of a vessel.

■ Aside from these questions, the right of cancellation of a charter party does not arise out of any breach. In order to justify the rescission of a charter party, the character of the breach must be such as to defeat the purpose of the contract; otherwise recovery is confined to damages sustained. And the measure of damages recoverable by the vessel for refusal to load under the charter party of December 2, 1925, is the net amount the vessel would have earned under the charter party, less the net amount actually earned during the period that would have been consumed by its performance or that could have been earned by reasonable diligence during said period. Cornwall et al. v. J. J. Moore & Co. (D. C.) 125 F. 646; Thebideau v. Cairns (D. C.) 171 F. 233.

My finding is that the loss or damage recoverable by the libelant is $3,427.38, with interest from March 6, 1926, at the Florida rate of interest, 8 per cent. per annum.

Accordingly, decree will be entered.